Rachel EVANS et al., Appellants,

v.

James T. LYNN et al., Appellees,

v.

The TOWN OF NEW CASTLE,
Appellee-Intervenor.

No. 157, Docket 74–1793.

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1974.

Decided June 2, 1975.

Resubmitted Oct. 20, 1975.

On Rehearing En Banc June 4, 1976.

J. Christopher Jensen, Yonkers (Richard F. Bellman, Lois D. Thompson, Suburban Action Institute, Yonkers, of counsel), for appellants.

V. Pamela Davis, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Steven J. Glassman, Asst. U. S. Atty., of counsel), for Federal Appellees.

Arthur M. Handler, New York City (Andrea Hyde, Golenbock & Barell, New York City, of counsel), for appellee Town of New Castle.

Jeremiah J. Spires, New York City (Harry A. Gottlieb, Wikler, Gottlieb, Taylor & Howard, New York City, of counsel), for appellees Douglas Carroll, Director of Tri-State Regional Planning Commission, and Tri-State Regional Planning Commission.

**573**

## OPINION OF THE PANEL

Before MOORE, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves a legal challenge against policies of federal agencies said to flout the requirements of Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and Title VIII (Fair Housing) of the 1968 Civil Rights Act, 42 U.S.C. § 3601 et seq. Title VI requires federal agencies affirmatively to effectuate its anti-discrimination policy in programs receiving federal financial assistance, 42 U.S.C. §§ 2000d, 2000d–1.[1] Title VIII requires similar effectuation of its fair housing policies, 42 U.S.C. §§ 3601, 3608(c), (d)(5).[2] The federal agencies are the Department of Housing and Urban Development (HUD) and the Bureau of Outdoor Recreation of the Department of the Interior (BOR), whose respective grants to a municipal sewer district within the Town of New Castle, Westchester County, New York, for construction of a sanitary sewer, and to the Town itself for acquisition of "Turner Swamp" for recreational purposes[3] are challenged here as being made to a town that allegedly maintains a racially and economically discriminatory housing and community development program. Suit has also been brought against the regional planning agency, Tri-State Regional Planning Commission (Tri-State), which is the designated clearing-

---

1. 42 U.S.C. § 2000d.

 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

 42 U.S.C. § 2000d–1.

 Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the fail-

 ure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

2. 42 U.S.C. § 3601:

 It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

 42 U.S.C. § 3608:

 (c) All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes.

 (d) The Secretary of Housing and Urban Development shall—

 . . . . .

 (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.

3. The grant of matching funds for the sewer was made under the Community Facilities and Advance Land Acquisition Act, 42 U.S.C. § 3102, and the grant for the acquisition of Turner Swamp was made pursuant to the Outdoor Recreation Programs Act, 16 U.S.C. § 460*l*.

house which reviews and coordinates applications for federal grants-in-aid in certain counties of New York and New Jersey and certain planning regions of Connecticut, 42 U.S.C. § 3334(a)(1), and which declined to review the grants in question on the grounds that they lacked regional significance.

Appellants assert that they are minority residents of Westchester County who reside in racially concentrated areas of the county and are constrained to do so because the failure of the federal agencies to perform their affirmative duties permits the maintenance of a growing pattern of racial residential segregation both in New Castle and elsewhere in the county. Thus, the case is another in the series of cases in this court and others [4] raising one phase or another in the complex of legal, social, economic and moral problems engendered both by the emergence of the suburbs as increasingly important units of the metropolitan area, significant to the achievement of national goals, and by the realization that housing "does not mean shelter alone—it means a collection of services and opportunities based on locations." [5] The court below granted the Town of New Castle leave to intervene but denied appellants standing to sue on the basis that they assert no "injury in fact" since enjoining the grants in question would not alleviate their injury (in the form of "ghetto living conditions"); Judge Pollack added that their status as "potential residents" of New Castle did not change this result. (This ruling applied to the federal defendants and to Tri-State.) We disagree, expressing, however, no opinion on the question whether appellants have stated a claim for relief.

On the question of standing as to the federal agencies there are three facts which have to be assumed, as they were below, in the present posture of the case. First, appellants are low-income minority residents of Westchester County who live in "ghetto" conditions, that is, racially-concentrated low-income neighborhoods. [6] Second, a matter entirely overlooked in Judge Moore's dissent, the Town of New Castle, to or for whose benefit the challenged grants were made, is, in the words of the district court, "predominantly white [98.7 per cent] and a well-to-do enclave," 90 per cent of which is zoned for single-family, residential development on parcels of more than one acre, with a median value of single-family homes in 1970 in excess of $50,000; the Town has, not coincidentally, thwarted the New York State Urban Development Corporation's attempt to construct within its borders a small 100-unit low cost housing facility and thus in the words of the court below "continues to be resistant to attempts to alter its present housing character." [7] Third, the

---

4. *E. g., Citizens' Committee for Faraday Wood* v. *Lindsay,* 507 F.2d 1065 (2d Cir. 1974); *Kennedy Park Homes Ass'n* v. *City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). *See generally* A. Downs, Opening Up the Suburbs: An Urban Strategy for America (1973); Branfman, Cohen & Trubek, *Measuring the Invisible Wall: Land Use Controls and the Residential Patterns of the Poor,* 82 Yale L.J. 483 (1973); Shields & Spector, *Opening Up the Suburbs: Notes on a Movement for Social Change,* 2 Yale Rev.L. & Soc.Action 300 (1972). *But see* Glazer, On "Opening Up" the Suburbs, The Public Interest 89 (1974). An interesting text in the field is Haar & Iatridis, Housing the Poor in Suburbia: Public Policy at the Grass Roots (1974) (hereinafter Haar).

5. See Haar, *supra* n.4 at 320.

6. None of the appellants has been refused the sale or rental of housing in New Castle, has any interest in land within the town or has any connection with any plan or proposal to construct housing for them within the town. Appellant Evans concedes that since September, 1973, she has resided in "decent housing" in a public housing development, with "fine" space. (Her complaint alleging residence in substandard housing was filed August 8, 1973.) It is not claimed that the sewer or park projects will be operated discriminatorily.

7. As is recounted in Haar, *supra,* at 360–61, the State Urban Development Commission (UDC) had housing plans for nine of Westchester County's 18 towns, including New Castle.

By going into 9 of Westchester's 18 towns at once, [the UDC president] hoped to avoid putting any one local government on the spot. Instead he has found himself up against a coalition of private citizens and private officials attacking the agency on the issues of big government, local control, and home rule.

challenged federal agencies, in approving the grants in question, did very little by way of evaluating the Town's development policies or otherwise,[8] to perform any allegedly affirmative duties required of them by Title VI and Title VIII respectively;[9] the approval of each grant in question was based solely on its internal merits (as to which there is no dispute, that is, no claim that either the sewer system or recreation area will be administered discriminatorily).

Assuming these underlying facts, we first face the question whether appellants are arguably within the zone of interests protected by the statutes, that is, whether there is a viable claim that affirmative duties are imposed upon these federal agencies by Titles VI and VIII which would require them to take some action, not taken here, on behalf of county residents such as withholding otherwise proper grants. Absent such an arguable claim of affirmative duties owed to appellants, they are not within any zone of statutory protection. *Association of Data Processing Service Organizations, Inc.* v. *Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Put another way, we must consider whether either of these agencies is alleged to have "consciously and expressly adopted a general policy

---

United Towns for Home Rule . . . was formed by several dozen residents from three of the northern Westchester towns three days before the UDC formally announced its plan . . . .

"What we are saying to the UDC," says Stuart Greene of New Castle, the organization's president, "is, We have not been consulted, you do not have our consent. If we want New York City to move into New Castle, we'll tell you."

Governor Rockefeller and Edward J. Logue, president of the State Urban Development Corporation, have apparently decided to defer the UDC's building plans in Westchester County for four months to give the nine towns involved a chance to come up with multi-family housing plans of their own. (*The New York Times,* September 26, 1972.)

The chairman of United Towns for Home Rule, the group that has led the opposition to the state Urban Development Corporation's housing plans in Westchester County, announced yesterday that he was resigning because others in the group's leadership wanted to take it off a present course he characterized as 'moderate.'

In an interview last July, Chairman Greene, a Harvard-educated lawyer, had said he feared that race prejudice rather than the philosophy of local home rule might emerge as the dominant theme in the anti-UDC protest. "The minute I lose a vote to a redneck, I quit," he said then.

Asked whether the events he feared had in fact come to pass, he said, "Yes." (*The New York Times,* October 10, 1972.)

The foregoing Times excerpts were quoted in Haar, *supra* n.4 at 360–61.

8. The HUD "rating sheet" for the preliminary application for the sewer grant here does carry some points for, *e. g.,* the "Percent of housing in project area that will be accessible on a nondiscriminatory basis to families and individuals with low and moderate incomes," but there appears to be no evaluation of the overall residential segregation policies of the community. It is a matter of defense on the merits, on which we express no opinion, whether the agencies in fact performed their affirmative duties; for our purposes it is enough if a viable claim of nonperformance is made.

9. The project approvals here came after President Nixon's 8,000 word policy statement concerning equal housing opportunity on June 11, 1971, in the course of which he declared that his administration would "not attempt to impose federally assisted housing upon any community." *See* Haar, *supra* n.4 at 319, 321–22. *Cf.* N.Y. Times, Dec. 21, 1970, at 1, col. 1, regarding Dayton, Ohio:

The officials [of Dayton], most of whom are Republicans, are worried about how much support they will receive from Washington. They believe the plan fits the philosophy expressed repeatedly by George Romney, Secretary of Housing and Urban Development, but they are disturbed by President Nixon's news conference statement last week that "forced integration of the suburbs is not in the national interests."

The Dayton plan, they say, is voluntary, not forced, but one of the factors that brought its acceptance was the belief that H.U.D. would use Federal grants in a way that would encourage open communities.

"If political pressures build up so that the suburbs can continue to flout low and moderate income housing and still get their money from Washington there is little we can do," said one official.

Further, the development here illustrates what is involved in the housing controversy that has been under way in the national government. Plans by the Department of Housing and Urban Development to make a strong stand for open communities in the administration of Federal grants have been questioned by Attorney General John N. Mitchell and the White House.

[of nonenforcement] which [is] in effect an abdication of its statutory duty." *Adams* v. *Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159, 1162 (1973) (en banc, per curiam) (ordering HEW to take affirmative action to end segregation in ten states' public educational institutions receiving federal funds, at suit of black "students, citizens and taxpayers"). We think such a viable claim is clearly made out under the express language of the Acts, nn. 1 and 2 *supra,* the legislative history and the case law.

Title VI requires effectuation of § 2000d by agencies "empowered to extend Federal financial assistance to any program or activity, by way of grant . . . ." 42 U.S.C. § 2000d–1. Title VIII requires administration of housing and urban development programs and activities in all agencies "affirmatively to further the purposes" of the Act, as expressed in 42 U.S.C. § 3601, n.2 *supra.*[10] It may be that, as the federal appellees suggest, because Title VI is somewhat limited in remedy, it is not so much involved, although this is a question ultimately on the merits; Title VI contains language in its so-called "pinpoint provision" that limits the power of the agency to terminate funding "to the particular program, or part thereof, in which such [discrimination] has been so found." 42 U.S.C. § 2000d–1, n.1 *supra.* *See Gautreaux* v. *Romney,* 457 F.2d 124 (7th Cir. 1972) (HUD could release Model Cities funds to city independent of city housing authority's discriminatory site selection and tenant assignment procedures). *See* 86 Harv.L.Rev. 427 (1972).

But the same limitation or "pinpoint provision" does not apply to Title VIII. The legislative history of Title VIII is indicative of its scope. In introducing the legislation Senator Mondale referred to the

> sordid story of which all Americans should be ashamed developed by this country in the immediate post World War II era, during which the FHA, the VA, and other Federal agencies encouraged, assisted, and made easy the flight of white people from the central cities of white America, leaving behind only the Negroes and others unable to take advantage of these liberalized extensions of credit and credit guarantees.
>
> Traditionally the American Government has been more than neutral on this

---

**10.** Arguably, the fact that the grants are made to a community which is *near* an urban area would not necessarily make them grants relating to "urban development," since in an era of superhighways and jet travel every community is in a real sense near an urban area. Title VIII, 42 U.S.C. § 3608(c), requires only that the agencies "administer their programs and activities *relating to housing and urban development*" (emphasis added) affirmatively to further fair housing. Similarly, 42 U.S.C. § 3608(d)(5) specifically requires HUD so to administer its programs and activities "relating to housing and urban development . . . ." Arguably neither the HUD grant here nor the BOR recreation grant is for a program relating to housing or to urban development.

We are aided here, however, by the interpretation of Title VIII by HUD itself, one which is entitled to substantial weight. *Udall* v. *Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). HUD has formally stated as recently as October, 1972, that the affirmative action requirements *do* extend to grants for sewer installation such as here involved:

> A substantial number of programs are subject to these affirmative provisions including those relating to urban renewal, model cities, *grants for sewer and water installation,* roads, schools and other public facilities relating to urban development.

U. S. Dep't of Housing and Urban Development, Historical Overview—Equal Opportunity in Housing, *quoted in* P–H Equal Opportunity in Housing ¶ 2301, at 2316 (emphasis added). The HUD regional administrator stated in his deposition that the Water and Sewer Program was subject to Title VIII requirements. This explains the rating or selection system which, as he said, "did give extra points to those communities with open housing policies."

The same might not be said of the BOR grant which was from the Land and Water Conservation Fund, n.3 *supra.* A grant made under that Act would not necessarily be a "housing" or "urban development" grant under Title VIII. But BOR itself considers New Castle an urban area, both as having a population of over 2,500 and as a satellite community. And BOR's Regional Director demonstrated the nexus which appellants urge, in his deposition that "existing housing patterns and desirable housing patterns ought to be a factor in the planning process in assessing [recreation] needs and we attempt to encourage consideration of all community needs and not just to leave ourselves merely concerned with recreation, because it's important to the fabric of this system."

issue. The record of the U.S. Government in that period is one, at best, of covert collaborator in policies which established the present outrageous and heartbreaking racial living patterns which lie at the core of the tragedy of the American city and the alienation of good people from good people because of the utter irrelevancy of color.

114 Cong.Rec. 2278 (1968).

So too Representative Celler said: "The purpose or 'end' of the Federal Fair Housing Act is to remove the walls of discrimination which enclose minority groups in ghettos . . . ." 114 Cong.Rec. 9563 (1968).

The cases relating to duties created by Titles VI and VIII include *Shannon v. HUD,* 436 F.2d 809 (3d Cir. 1970); *Brookhaven Housing Coalition* v. *Kunzig,* 341 F.Supp. 1026 (E.D.N.Y.1972); *Garrett* v. *City of Hamtramck,* 335 F.Supp. 16 (E.D. Mich.1971). *See also Otero* v. *New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973). The Third Circuit held in *Shannon, supra,* that HUD could not approve a change in an urban renewal plan (from "owner occupied" to "rent supplement" dwellings) without considering under the affirmative duty requirements of Titles VI and VIII whether "the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial discrimination." 436 F.2d at 822. So holding, the court said that "Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy." 436 F.2d at 821. Clearly the federal government, to the extent it is in the business of granting housing and development funds to communities, is in a central position to exert influence upon, or against, concentration of minority groups in limited areas. As put in dictum by Mr. Justice Stewart in *Jones* v. *Alfred H. Mayer Co.,* 392 U.S. 409, 417, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), Title VIII at least is "a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority." Here appellants claim no influence was exerted; the housing law remained unenforced.

We must not only be aware of, we must be guided by the teaching of *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972), a case involving the question whether complaining tenants were within the class of persons expressly entitled to use under § 810(a) of the Civil Rights Act of 1968, 42 U.S.C. § 3610(a), that in connection with fair housing litigation "the main generating force must be private suits . . ." and that "the reach of the proposed law was to replace the ghettos 'by truly integrated and balanced living patterns' [quoting Senator Mondale]." So, too, the Court has advised us that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R. S.* v. *Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973), citing *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U.S. at 212, 93 S.Ct. 364. (White, *J.,* concurring). The limitation on this is that there must be an "indication that invasion of the statutory right has occurred or is likely to occur." *O'Shea* v. *Littleton,* 414 U.S. 488, 494 n.2, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Here the "statutory right" is to have programs and activities "relating to housing and urban development" administered in furtherance of the fair housing policy. That right is invaded by grants for sewer facilities or acquisition of recreation areas in urban communities which are not so administered.

We are satisfied, then, that the first of the two prongs of the test of standing is met; appellants are arguably within the zone of interests protected by Titles VI and VIII. The inaction on the part of the federal agencies here may have created a breach of their affirmative duties under these Acts and these Acts were designed to protect people such as these appellants who continue to live in ghettoized communities in the New York City metropolitan area.

Title VI protects every person in the United States from discrimination in applicable projects, and Title VIII seeks to ensure fair housing throughout the United States. 42 U.S.C. §§ 2000d, 3608, nn. 1 and 2 *supra.*

Have, however, the appellants demonstrated a nexus between their injury (it is postulated in the opinion of the district court that "ghetto living conditions are a very real and very serious 'injury'") and the claim of omission of federal civil rights enforcement with respect to the New Castle community development grants? That is, is there asserted an "injury in fact" to these appellants? If we were to look, as the appellees and intervenor would have us look, solely toward New Castle's housing and land-use policies, we would have to answer in the negative, if for no other reason than that a recent decision of this court, *Warth* v. *Seldin,* 495 F.2d 1187 (2d Cir.), *cert. granted,* 419 U.S. 823, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974), would require us to do so.[11] In this respect, appellants have no connection whatsoever with New Castle; there is no showing that they would even try to live in New Castle.

But the gist of appellants' complaint is the failure of HUD and BOR to implement Title VIII, the fair housing law, an act which was intended to change the functions of federal grant programs the history of which, as Senator Mondale's quoted remarks suggest, reinforced existing, if not created new, patterns of racial segregation.[12] In this instance appellants allege injury from appellees' allocation of funds to New Castle in violation of Titles VI and VIII which contributes to the perpetuation of appellants' living patterns in the New York City metropolitan area.

Here, then, are agencies with an affirmative duty to encourage fair housing. Allocation of grants without assessing their im-

pact on integration not only may maintain the status quo of living patterns, resulting in injury to those who must continue to live in ghettos, but may also increase the disparity between living styles by supporting "white enclaves" while diverting funds which otherwise would have been used to alleviate ghettoization. In *United States* v. *SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), plaintiffs alleged that the Interstate Commerce Commission's failure to suspend increased freight rates would discourage use of recycled products to the detriment of the environment which they enjoyed. Such omission, they claimed, violated the ICC's duties under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C). The Court found those plaintiffs aggrieved within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 702. *Id.* at 685, 93 S.Ct. 2405. The Court also held that

To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion. *Id.* at 688, 93 S.Ct. at 2416. As in *SCRAP* we have plaintiffs injured in fact by administrative inaction. *See Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Scenic Hudson Preservation Conference* v. *FPC,* 354 F.2d 608 (2d Cir. 1965), *cert. denied,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). *Cf. Scanwell Laboratories, Inc.* v. *Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). This is sufficient to give plaintiffs standing to challenge administrative violations of statutory duties. This case is distinguishable from the recent Supreme Court cases so heavily relied upon in Judge Moore's dissent,[13] in which standing was

---

11. *Warth* held that "potential residents" of a community lacked standing to challenge its exclusionary zoning policies.

12. *See* Haar, *supra* n. 4 at 338 (mortgage insurance and aid to highways as examples of "federal funds . . . partly responsible for present residential socio-economic segrega-

tion"); U. S. Comm'n on Civil Rights, Equal Opportunity in Suburbia 43 (July 1974).

13. *O'Shea* v. *Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *United States* v. *Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (constitutional challenge to

denied to plaintiffs bringing constitutional challenges to statutes since they contain an underlying, if not articulated, minor premise that Congress cannot enact a statute conferring standing to bring a constitutional challenge. *See* Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1380–83 (1973). But where Congress has created a duty, Congress can declare that anyone aggrieved can enforce the corollary right. Again, standing is conceptually broader where a statutory duty has been violated than when prosecutorial or judicial discretion is challenged, since there is no statute conferring review of such actions.[14]

So that our decision may be very clearly understood, we hold only that appellants have standing as to the federal agencies to challenge the particular grants in question. We do not do so on the basis that they have a sufficient connection with the community to or for the benefit of which the grants are made. We do so purely and simply because one important method of enforcement of the congressional policy set forth in Title VIII is by the agencies' administration of grants related either to housing or urban development. The grants here involved, made to an urban community, or one that is satellite to a metropolitan area of which appellants are residents, are so related. *United States* v. *SCRAP, supra; Trafficante* v. *Metropolitan Life Insurance Co., supra; Adams* v. *Richardson, supra.*

My brethren are in accord that the complaint against Tri-State must be dismissed. In stating my dissenting view, I note that while Tri-State is an interstate body, both corporate and politic, serving as a common agency of Connecticut, New Jersey and New York, created by compact,[15] it has been designated as the areawide clearinghouse for review of applications for federal aid to assure conformance with regional comprehensive plans, a designation which occurs under Circular A–95, promulgated by the Office of Management and Budget, *see* 38 Fed.Reg. 228 (1973), to implement the Demonstration Cities and Metropolitan Development Program Act, 42 U.S.C. § 3334, and the Intergovernmental Cooperation Act, 42 U.S.C. § 4231. The latter commands consideration of impact of the proposed program upon housing and human resources development. 42 U.S.C. § 4231(c). The A–95 Circular specifically calls for comment on the "civil rights aspect of the project," ¶ 3(d), and "[t]he extent to which the project contributes to more balanced patterns of settlement and delivery of services to all sectors of the area population, including minority groups." ¶ 5(d).

It is true that all that Tri-State allegedly did here was to say that the proposed grants had no "regional significance." But it seems to me that appellants are precisely those minority persons who are disadvantaged by unbalanced "patterns of settlement and delivery of services."

Judgment reversed and remanded as to James T. Lynn, the Department of Housing and Urban Development and the Bureau of Outdoor Recreation of the Department of the Interior; judgment affirmed as to appellee Tri-State Regional Planning Commission.

MOORE, Circuit Judge (dissenting):

Essentially there is presented in this litigation the question of the extent to which, at the behest of the plaintiffs, the judicial

---

act permitting CIA not to disclose all its expenditures). *Cf. Schlesinger* v. *Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (no standing to challenge Congressmen's reserve statute as violative of the incompatibility clause).

**14.** *O'Shea* v. *Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (no standing to challenge bond-setting, sentencing and jury fee practices as violative of 42 U.S.C. §§ 1981–83, 1985); *Linda R. S.* v. *Richard D.,* 410 U.S. 614,

93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (no standing to compel prosecution of the father of plaintiff's illegitimate child for nonsupport).

**15.** Conn. Public Acts, 1965, P.A. 413; Laws of N.J., 1965, c. 12; Laws of N.Y., 1965, c. 413. The Compact was amended in 1972 to expand Tri-State's role to embrace responsibility for comprehensive planning for the compact region, Conn. Public Acts, 1971, P.A. 450; Laws of N.J., 1971, c. 161; Laws of N.Y., 1971, c. 333.

branch of our constitutional government can override, or veto the exercise of, discretionary judgments made by the executive and legislative branches in connection with grants of federal funds made pursuant to the Community Facilities and Advance Land Acquisition Act, 42 U.S.C. § 3102 (1972) and the Outdoor Recreation Programs Act,. 16 U.S.C. § 460l (1963). Obviously an abstract answer cannot be given, as it were, in a vacuum. Hence the facts essential to a resolution of this controversy must be analyzed with great particularity. In short, who are the plaintiffs, what relief do they seek, what is the legal basis for their alleged grievance, who are the defendants, what wrongs have they allegedly committed and finally wherein did the trial court commit error in the judgment appealed from?

## THE PLAINTIFFS

Plaintiffs describe themselves as Black residents, respectively, of the Town of Peekskill, the City of Mount Vernon, the City of White Plains and the Town of Ossining, all in Westchester County, who (with the exception of the plaintiff Evans) express a desire to live in the Town of New Castle, also in the same County, but profess inability to do so because of New Castle's alleged "discriminatory land use practices." [1]

## THE DEFENDANTS

The defendants are James T. Lynn, as Secretary of the Department of Housing and Urban Development (HUD); Joseph D. Monticciolo, Acting Area Director of HUD (New York); S. William Green, Regional Administrator of HUD; HUD; Douglas Carroll, as Director of Tri-State Regional Planning Commission (Tri-State); Tri-State; Rogers C. B. Morton, as Secretary of the Department of the Interior (Interior); James A. Watt, as Director of the Bureau of Outdoor Recreation (BOR) of Interior; and Interior.

## THE COMPLAINT

### The King-Greeley Sewer District Grant

The complaint, in substance, alleges that New Castle in 1969 determined to install in the Chappaqua section [2] of New Castle a sanitary sewer system. For this purpose it created the King-Greeley sewer district.[3] New Castle thereafter made an application to HUD for federal financing of the project.[4] "HUD was specifically notified that black and Spanish-speaking persons and all other persons of low income would be denied the opportunity to benefit from Federal funding of the King-Greeley sewer project by virtue of the fact that New Castle through its housing and zoning laws prevents the development of low and moderate income housing." (Complaint, par. 21.) Nevertheless HUD granted $358,000 for the project.

The emphasis of the complaint is on New Castle's alleged housing, zoning and land use policies. Neither New Castle nor King-Greeley were named as defendants.[5] Plaintiffs seek indirectly to obtain their objective not by a frontal attack on New Castle on the theory of unconstitutional zoning [6] but

---

1. Plaintiff Brooks, Jr., merely wishes to move to "safe and sanitary housing in the County which he can afford."

2. Hamlet of Chappaqua.

3. King-Greeley was organized under the New York Town Law (McKinney 1965).

4. The application in the name of "King-Greeley Sanitary Sewer District," dated January 9, 1972, was submitted to HUD.

5. Their presence in the case is as subsequent intervenors.

6. King-Greeley has no zoning authority or powers. In *Warth* v. *Seldin*, 495 F.2d 1187 (2d Cir.), *cert. granted*, 419 U.S. 823, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974), this court was faced with a direct (not oblique, as here) attack on the zoning ordinances of the town of Penfield, a suburb of Rochester. There builders had been denied the opportunity to construct multi-family housing in Penfield. The plaintiffs claimed that Penfield's zoning ordinances were unconstitutional because they barred low and middle income persons, especially members of racial minority groups, from residing in Penfield. After reviewing *Baker* v. *Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Association of Data Processing Service Organizations, Inc.* v.

by an oblique attack on HUD for failing, in making the sewer grant, "to affirmatively promote fair and suitable housing irrespective of race, color, creed, or national origin pursuant to 42 U.S.C. 3608(d)(5)." (Complaint, par. 36, First Cause of Action); and that HUD by the grant did "assist and encourage New Castle in its practice of racial discrimination" and denying to plaintiffs "their right to participate in the receipt of Federal benefits." (Complaint, par. 37, Second Cause of Action.)

Plaintiffs assert that they "are Black citizens suffering from a lack of fair housing opportunity in the County in which they reside—" (Brief, p. 23) and attribute this suffering to the agencies vested by Congress with the power to administer and allot the financial grants made available by Congress in alleging that "they [the agencies] have neglected to administer the civil rights requirements of the community development assistance programs to promote an increased supply of integrated housing . . ." (Brief, p. 23) and that "[t]he housing and land-use policies of New Castle are certainly an effective measure of the extent to which HUD and BOR have violated their independent civil rights obligations." (Brief, p. 25.) Plaintiffs would have the judiciary focus by means of this litigation on "the specific and nationwide abdication by HUD and BOR of their statutory civil rights obligations, as reflected by their failure to engage in any meaningful civil rights review of the New Castle applications for federal community development grants." (Brief, p. 25.)

*The Turner Swamp Grant*

In 1971 New Castle proposed to acquire some 35 acres of land consisting largely of a bog or marsh area. New Castle requested Federal aid for this Open Space and Recrea-

tion project. A review was made by the requisite agencies, Tri-State, Westchester's Department of Planning and appropriate sub-regional planning agencies and municipalities. Tri-State classified the project as "one of non-regional significance." After an inspection by an inspector of BOR who reported that the site ("almost entirely marsh and bog") seemed "to provide excellent wildlife habitat and the proposed impoundment should enhance this quality," a grant (approximately one-half of the estimated cost of $115,000) was made by Interior. Tri-State characterized the area as "a highly suitable conservation area for use as a managed wildlife area, where a varied wildlife population already exists and needs only to be encouraged." (Tri-State Appendix 11.)

THE PROCEEDINGS BELOW

On September 13, 1973, the defendants, the Secretaries of HUD and Interior and certain Directors of various divisions thereof moved to dismiss the complaint pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P. An affidavit of an Assistant United States Attorney pointed to the alleged weakness of the complaint by stating that plaintiffs made no allegation therein that either the Sewer District or the Turner Swamp would be in any way discriminatory or would not serve all residents equally "black, or white, rich or poor."

On October 9, 1973 plaintiffs moved for a preliminary injunction enjoining HUD from disbursing any funds for the King-Greeley sewer district and Interior from disbursing funds for the acquisition of the Turner Swamp.

The trial court, believing that it could not adequately pass upon the issues raised by both motions without a record showing what HUD and BOR had done prior to

*Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Flast* v. *Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *O'Shea* v. *Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Barlow* v. *Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); and other

cases, this court concluded that to grant injunctive relief or to make a declaration that zoning was unconstitutional upon the facts presented would be "too abstract, conjectural and hypothetical to establish an Article III case or controversy" (p. 1193) and affirmed "on the ground that appellants lack standing." (p. 1189).

approving the grants, directed that the administrative files of each Department relating to the grants in question be made available to the plaintiffs and that the federal administration officials involved be produced for depositions.

Accordingly, during November 1973 the depositions of S. William Green, Regional Administrator (HUD); Gerald V. Cruise, Program Manager (HUD); Susan Alem, Resources Development Officer (HUD); Robert E. Mendoza, Metropolitan Development representative (HUD); Bernard C. Fagan, Outdoor Recreation Planner (BOR); and Maurice D. Arnold, Regional Director (BOR) were taken. Various exhibits were introduced.

Prior to decision and by letter dated March 9, 1974, New Castle and King-Greeley sought to intervene. The deposition of the plaintiff Evans was thereafter taken.

On April 5, 1974, many of the key factual issues were resolved by a Stipulation of Facts entered into (by counsel) by the plaintiffs and New Castle (King-Greeley). The substance of the stipulation was that none of the plaintiffs had "looked for housing for himself or his family in the Town of New Castle"; that no plaintiff or the town of his residence had been deprived of the federal funds granted as herein described; that plaintiffs had no information to believe that non-residents of New Castle would be refused admission to the proposed park (Turner Swamp) for any reason including race, creed, color or income; that no claim is made that persons residing in the King-Greeley district will be denied use of the sewer for reasons of race, creed, color or income; and that there is no claim that the Turner Swamp area has been utilized for low or moderate multi-family housing.

Upon this stipulation and lengthy affidavits with exhibits attached, the deposition of the plaintiff Evans, New Castle and King-Greeley, joined the federal defendants' motion to dismiss.

Tri-State had also moved to dismiss pursuant to Rule 12(b)(1), (2) and (6), an attorney affidavit accompanying the motion, stating that it was "upon grounds of sovereign immunity". Tri-State had been formed pursuant to an Interstate Compact (New York, New Jersey and Connecticut) wherein in Article IV, sec. 3 it is declared that "It [the Commission] shall enjoy the sovereign immunity of the party states and may not be sued in any court or tribunal whatsoever; . . . ."

THE OPINION BELOW

As a preamble, in effect, to the opinion, the court noted that the plaintiffs had been "accorded a wide opportunity to make a factual determination of the New Castle applications and the civil rights enforcement procedures utilized by the federal defendants." Equally the defendants "had an opportunity to elicit the facts concerning the interest of the plaintiffs." The court concluded that the "legal issue of standing raised by the motions, is now cast in sharp relief against this well-developed factual background."

The court then turned to the threshold and, in its opinion, decisive issue, i. e., "whether plaintiffs have standing to bring this suit." Standing was then tested by "the two-pronged test" namely, have the plaintiffs suffered or will they suffer an "injury in fact" and are they "within the zone of interests protected by the relevant statute." The court was also mindful of the necessity that "litigants maintain a personal stake in the outcome of the controversies they present." *DeFunis* v. *Odegaard*, 416 U.S. 324, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

From the proof submitted, the court concluded that "Plaintiffs do not, and apparently cannot, allege that they will suffer any injury from the grants that have been made by the agencies," which grants clearly insure that New Castle must not discriminatorily administer the sewer or swamp projects. (See "Assurance of Compliance" of HUD and BOR). Accordingly, the court denied plaintiffs' motion for an injunction and dismissed the complaint for lack of jurisdiction.

## I

Before the motions were finally submitted to the court for decision, they had acquired somewhat of a hybrid character. The original government defendants' motion to dismiss pursuant to Rule 12(b)(1) and (6), Fed.R.Civ.P., was supported by a five-page affidavit setting forth facts. Plaintiffs' motion for a preliminary injunction was based on two lengthy affidavits. Tri-State's motion was supported by an affidavit and New Castle-King-Greeley's motion by affidavits of 19 pages and 7 pages plus exhibits. The motion to dismiss thus assumed the status of a motion for summary judgment which in decision the court restricted to the issue of standing. However, only by this factual development was the court able to "cast [this issue] in sharp relief." For purposes of appellate review, "standing" may be assumed to be the sole issue to be determined in light of all the facts developed by the trial court in aid of such determination.

## II

Prior to embarking upon a discussion of how the Supreme Court has defined, and granted or denied, jurisdictional standing, it would be well to capsulate the nature of this action in terms of plaintiffs' objectives. First, the negative. They do not claim that they have been denied housing or land purchase in New Castle because of color. They do not seek to overturn the New Castle's zoning ordinances as unconstitutional. They do not assert that the funds appropriated will deprive any low-cost housing project thereof. They do not claim that there are any discriminatory features in the sewer and swamp grants.

Affirmatively what they seek is to prevent HUD and BOR from using federal funds (1) for aid in constructing a sewer in a small densely populated section of the Town of New Castle where neither housing or zoning are in question because the area is already well built up on quarter and half acre plots [7] which area is badly in need of sewers for reasons of health; [8] and (2) from acquiring a swamp to protect the environmental quality of the area by preserving open spaces for a wildlife sanctuary and for educational purposes, the very goal and concern of so much of our current legislation.

Another pertinent inquiry at this stage is: what would be the result of success for plaintiffs in this litigation? Primarily it would be to prevent their fellow-citizens who are as much in need of sewers as they claim to be in need of housing from having sanitary sewers and a wildlife sanctuary or park, thus preserving fast-shrinking open spaces. But a far more dangerous result would be the establishment of a principle that the judgment and discretion exercised by the executive and legislative branches of government can be examined and questioned (or even overturned) by any citizen, aided by the judiciary, to determine whether the decision (such as HUD's and BOR's here) was to their liking. In short, all administrative agencies will have to make their decisions with the knowledge that Big Brother [9] in the guise of a private attorney-general is peering over their respective administrative shoulders.

In sum, plaintiffs, in a suit challenging only a sewer and a park, seek by an oblique

---

7. Tri-State Appendix 4. "The area is almost entirely developed with existing residential and business uses . . . the establishment of sewers in the King-Greeley Sewer District area will not alter, or offer the opportunity to alter, the range of densities proposed for residential development, since the area is already substantially developed with single-family homes that are of good quality and have a considerable period of useful life remaining." Letter, December 28, 1971, Commissioner of Westchester County Department of Planning to New Castle Town Engineer. Tri-State Appendix 29.

8. "[T]he extension of sewers into the service area will greatly improve the environmental and public health aspects of this central area of your town . . . [and is an] improvement of the highest priority, and one which should receive every favorable consideration for Federal aid."

9. G. Orwell, 1984, written in 1949 as a fantasy. Now with only nine years remaining to stave off the prophecy, the date is becoming dangerously close.

coercive proceeding to have this court, in effect, direct HUD to provide more housing throughout the nation. This conclusion is well-illustrated by their argument that "the lack of federal administrative pressure on New Castle to encourage fair housing opportunity within its borders through local housing and community development policy directly and materially contributes to growing patterns of racial segregation in Westchester County." (Applt's Brief, p. 39).

In fairness to HUD and BOR they are entitled to have set forth what they did before making the grants in question. No claim is made that any project discrimination exists as to the King-Greeley or Turner Swamp projects. Title VI, 42 U.S.C. § 2000d. HUD also attempted to follow the requirements of Title VIII, 42 U.S.C. § 3601 et seq., albeit the loss of the original rating sheet required reconstruction and there were differences of opinion within the Department. Furthermore, the sewer project had been approved by the appropriate County and State departments. Likewise, as to the Turner Swamp, Interior through BOR and the State Liaison Officer had rated the project as qualified for a grant.

### III

The guiding principles of law applicable to the proper decision here are to be found in Supreme Court's recent decision in *O'Shea* v. *Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). There, as here, an injunction was sought on the basis that the defendants "have engaged in and continue to engage in, a pattern or practice of conduct . . . all of which has deprived and continues to deprive plaintiffs of their constitutional rights." The Supreme Court gave a most explicit statement as to the essentials for "standing" stating:

"Plaintiffs in the federal courts 'must allege some threatened or actual injury resulting from some putatively illegal action before a federal court may assume jurisdiction.' . . . There must be a 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon

which the court so largely depends for illumination of difficult constitutional question.' . . . Nor is the principle different where statutory issues are raised. . . . Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. . . . The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" (pp. 493–94, 94 S.Ct. p. 675) (citations omitted).

Within the year the Supreme Court has again reaffirmed its views as to standing in *United States* v. *Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 and *Schlesinger* v. *Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (both decided June 25, 1974). In these recent decisions the Court expressed its opinion as to the effect of its former (although also recent) decisions defining standing. Since these former decisions are heavily relied upon by the majority, an analysis of the June 25, 1974 decisions and some of the preceding decisions should suffice to demonstrate that the majority opinion cannot be reconciled with them.

In *Schlesinger* the Court "recognized the continued vitality" of *Ex parte Lévitt*, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (p. 220, 94 S.Ct. 2925), and reaffirmed that decision, holding that there must be a concrete injury "actual or threatened", namely, "a particular injury caused by the action challenged as unlawful"—in short, a "particular injury" and a "personal stake." This concrete injury "is especially important when the relief sought produces a confrontation with one of the coordinate branches of the Government;" and "the relief sought would, in practical effect, bring about conflict with two coordinate branches." (p. 222, 94 S.Ct. p. 2932.) What the plaintiffs seek to achieve here would indeed "distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government

by injunction.'" (p. 222, 94 S.Ct. p. 2933). In holding that there was no citizen standing in *Schlesinger*, the Court noted the restrictive nature of *Association of Data Processing Service Organizations* v. *Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ("private competitive injury"), and *United States* v. *SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("individual enjoyment of certain natural resources impaired").

In *Richardson*, the Court observed that there is a modern tendency to call upon the courts to solve all problems of society but adhered to the "personal stake" requirement, stating:

> "As our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than in any period of our national development. The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must have a 'personal stake in the outcome,' . . . in short, something more than 'generalized grievances,' . . . ." (pp. 179–80, 94 S.Ct. p. 2948) (citations omitted).

The concern of Mr. Justice Powell regarding "the expansion of judicial power" should well be a worry here. In his concurrence he wrote:

> "Relaxation of standing requirements is directly related to the expansion of judicial power. It seems to me inescapable that allowing an unrestricted taxpayer or citizen standing would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government. I also believe that repeated and essentially head-on confrontations between the life-tenured branch [the judiciary] and the representative branches of government will not, in the long run, be beneficial to either." (p. 188, 94 S.Ct. p. 2952) (footnote omitted).

It would be in the Justice's opinion, as it is in mine, highly inconsistent "if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." (p. 188, 94 S.Ct. p. 2952) (footnote omitted). "Unrestrained standing in federal taxpayer or citizen suits would create a remarkably illogical system of judicial supervision of the coordinate branches of the Federal Government." (p. 189, 94 S.Ct. p. 2952).

In the same vein, Mr. Justice Powell commented that "recourse to the federal courts [where the Federal Government has allegedly been unresponsive to recognize needs or serious inequities in our society] has attained an unprecedented popularity in recent decades. Those courts have often acted as a major instrument of social reform." (p. 191, 94 S.Ct. p. 2953). But he observed "how often and how unequivocally the Court [the Supreme Court] has expressed its antipathy to efforts to convert the judiciary into an open forum for the resolution of political or ideological disputes about the performance of government." (citing cases) (p. 192, 94 S.Ct. p. 2954).

In *Sierra Club* v. *Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Sierra Club, whose members are interested in preserving woodlands and wildlife, in contrast to the destruction of forests and the construction of broad concrete highways, sought to enjoin the building of a vast resort and amusement center, including roadways, in the Mineral King Valley in California. The District Court had granted an injunction but the Court of Appeals reversed stating among other things that "We do not believe such club concern without a showing of more direct interest can constitute standing in the legal sense sufficient to challenge the exercise of responsibilities on behalf of all the citizens by two cabinet level officials of the government acting under Congressional and Constitutional authority." 433 F.2d 24, 30 (9th Cir. 1970).

The Supreme Court affirmed the Court of Appeals, writing with particular perti-

nence to the litigation before us, at page 732, 92 S.Ct. at page 1364: "Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."

Congress in the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Title VI) clearly evidenced its intention to limit the question of discrimination to the *particular* program in issue. *See* 42 U.S.C. § 2000d–1. As previously mentioned, no discrimination is claimed in either program here, and thus Title VI cannot support the standing of these plaintiffs. Nor is the Civil Rights Act of 1968 any more applicable. Congress clearly stated its intent: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

The Court in *Sierra Club* continues with the principle that: The "injury in fact" test requires more than an injury to a cognizable interest. "It requires that the party seeking review be himself among the injured." (p. 735, 92 S.Ct. p. 1366). The Court would deny standing to those "individuals who seek to do no more than vindicate their own value preferences through the judicial process."

The consequences of any other result were pointed out as follows: "And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." (pp. 739–40, 92 S.Ct. p. 1368).

In *United States* v. *SCRAP, supra,* the Court was dealing "simply with the pleadings in which appellees alleged a specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected." (p. 689, 93 S.Ct. p. 2416) (footnote omitted). The Court could not "say on these pleadings" that injury in fact could not be proven.

But in *Laird* v. *Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the respondents' claim "simply stated, is that they disagree with the judgments made by the Executive Branch . . . ." (p. 13, 92 S.Ct. p. 2325). On this subject the Court noted that: "Carried to its logical end, this approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; . ." (p. 15, 92 S.Ct. p. 2326). Accordingly the Court reversed a Court of Appeals decision which had reversed the District Court's denial of an injunction and dismissal of the complaint.

## IV
### THE MAJORITY OPINION

Court decisions should be made with an eye to, and with due regard to, the practical consequences thereof. The consequences of the majority's decision are that the residents of the Hamlet of Chappaqua will not have their much-needed sewer or park. And this, by court decree instigated by a group of plaintiffs who have no interest whatsoever in a King-Greeley sewer or a Turner Swamp park, neither of which projects admittedly has any discriminatory features. The majority states that "Here, then, are agencies with an affirmative duty to encourage fair housing." However, "fair housing" is not an issue in this case (if "case" it be). To say that plaintiffs' right to adequate housing "is invaded by grants for sewer facilities or acquisition of recreation areas in urban communities which are not so administered" is a most illogical *non sequitur*. Equally illogical is it to say that the allocation of funds to New Castle "contributes to the perpetuation of [plaintiffs'] living patterns in the New York metropolitan area." $358,000 and $57,500 would scarcely suffice for a low-cost housing project.

Admitting that plaintiffs do not have "a sufficient connection with the community to or for the benefit of which the grants are made", the majority believes that it can

exert court coercion upon HUD and Interior as well as Tri-State "because one important method of enforcement of the congressional policy set forth in Title VIII is by the agencies' administration of grants related either to housing or urban development." They then find that the grants "are so related."

## V

### TRI–STATE

Tri-State is not a federal agency. It has made its own independent appraisal of the King-Greeley sewer and Turner Swamp projects as of "non-regional significance." Accordingly, review of the projects was referred to the Westchester County Department of Planning. It scarcely befits the role of the federal judiciary to override and supersede the judgment of Tri-State in evaluating whether a sewer in a minute area of a town and a small wildlife park are of sufficient area concern as to call for Tri-State action and reaction. I find no error in Judge Pollack's dismissal of the complaint against Tri-State.

## VI

In conclusion I cannot reconcile the majority's holding with the Supreme Court's decisions in *Sierra Club, O'Shea, Richardson* and *Schlesinger*, all of which support Judge Pollack's denial of a preliminary injunction and dismissal of the complaint. Accordingly, I dissent and would affirm Judge Pollack's order.

GURFEIN, Circuit Judge (concurring and dissenting):

I concur in Brother Oakes' thoughtful opinion holding that the plaintiffs have standing with respect to defendants HUD and BOR. I must add some words of caution, however, to explain my position. I believe that Judge Pollack's decision was based on a pragmatic view that the case itself, so far as injunctive relief against the grant of federal funds is concerned, may ultimately end in a mere spinning of wheels, for the plaintiffs may not have suffered sufficient "injury in fact" to enjoin the federal grants. While Judge Oakes carefully notes that we are not deciding the merits, I would like to make my own position even clearer.

I would not hold that the plaintiffs necessarily have standing to seek injunctive relief against the Secretary of HUD and his assistants to restrain the grant of federal funds, for that involves the preliminary question of whether a determination of HUD to grant funds to New Castle is subject to judicial review and, if so, at whose instance, a matter we need not decide if we simply reverse the summary judgment. I would hold *only* that the plaintiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute" under the Administrative Procedure Act, 5 U.S.C. § 702, to raise the question of whether the Secretary has failed to make the inquiries implied from his affirmative duty to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter," Pub.L. 90–284, Title VIII, § 808(e)(5), April 11, 1968, 42 U.S.C. § 3608(d)(5), without any consideration of the merits of the lawsuit. See *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

In 1968 Congress passed the "Fair Housing" Act prohibiting discrimination in the sale or rental of housing. Civil Rights Act of April 11, 1968, Pub.L. 90–284, Title VIII, § 801, 42 U.S.C. § 3601. It contains the general affirmative duty provision noted. 42 U.S.C. § 3608(d)(5).

The Supreme Court has not yet determined whether the affirmative duty goes beyond enforcement of the sale and rental provisions of the Fair Housing Act. Nor has it decided whether, in the absence of hearing and notice provisions like those contained in the Civil Rights Act of 1964, Congress intended that the federal courts should review HUD's policies in relation to grants under the Housing and Urban Development Act of 1965, with the power to issue injunctions against federal assistance to non-pinpointed programs which are not, in themselves, discriminatory.

I think that, in conformity with our national policy to eliminate the disgrace of racial discrimination, the plaintiffs should be heard to test whether HUD has done its duty in the premises. *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), supports this result, as does *SCRAP, supra*.

Although the question is close, minority people fairly near the geographical area involved may be deemed "aggrieved" by agency inaction, at least in the general way that the environmentalist law students were injured by the inaction of the Interstate Commerce Commission in *United States* v. *SCRAP, supra*, or the class of black students in *Adams* v. *Richardson*, 156 U.S.App.D.C. 267, 480 F.2d 1159, 1162 (1973). The failure of the Executive Branch to enforce a statutory duty imposed on it may cause injury in fact to the class affected, even though, as Judge Oakes states, "no injury would exist without the statute." *Linda R. S.* v. *Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). That does not mean, to be sure, that they can compel judicial review. In that sense, as Judge Oakes recognizes, standing and judicial review are discrete issues.

In cases raising issues of discrimination, as well as environmental considerations, all that conferring standing under the Administrative Procedure Act does is to let an Article III "case or controversy" be heard with the sharp adversity required. See *SCRAP, supra*.

The courts must still determine the extent, if any, of permissible federal coercion by the withholding of federal assistance. Cf. *Adams* v. *Richardson, supra*. That is why it is proper to allow standing to these plaintiffs so that they may raise, in a judicial context, what the obligations of HUD are and whether HUD has met them. We should be liberal in granting standing where the challenge is to alleged administrative failure to act in the face of an alleged statutory duty, particularly in a civil rights case. As Judge Oakes notes, that is the meaning of *United States* v. *SCRAP, supra*. Cf. *Shannon* v. *HUD*, 436 F.2d 809 (3 Cir. 1970). In my view, a person may be an "aggrieved person" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702, to remedy administrative inaction without necessarily having standing for other relief. He may be aggrieved by HUD's failure to perform its statutory duty of inquiry, which is for his class benefit. He may not have been injured in fact sufficiently to coerce the executive agency to withhold funds.

On the standing to sue Tri-State I respectfully disagree with my brother Oakes. There must be some balancing of interests. To allow every denial of area significance to be reviewed by the courts, particularly at the instance of persons as remote from area considerations as these plaintiffs are, would simply invite a plethora of suits with a grave question of the ultimate judicial competence to solve them. Whether a sewer pipe in a town is a concern of a large area need not be litigated in the context of racial discrimination. It is better to dismiss the complaint against Tri-State now, as Judge Pollack did. In that respect I agree with Judge Moore though for somewhat different reasons.

Lastly, I must disassociate myself from my Brother Moore's statement that the issue is "the question of the extent to which, at the behest of the plaintiffs, the judicial branch of our constitutional government can override, or veto the exercise of, discretionary judgments made by the executive and legislative branches in connection with grants of federal funds made pursuant to the Community Facilities and Advance Land Acquisition Act, 42 U.S.C § 3102 (1972) and the Outdoor Recreation Programs Act, 16 U.S.C. § 460*l* (1963)." When Congress imposed on the Secretary of HUD the affirmative duty to administer all "programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter," 42 U.S.C. § 3608(d)(5), it did not mean that HUD could disregard that man-

date "in its discretion." In fact, HUD has adopted procedures to determine local racial policies in the case of the New Castle grant.

The case may well be a close case, but it is not out of the mainstream of court review of agency inaction in the face of a statutory duty. When Congress says federal funds shall not be used if certain conditions exist, the courts are often not without jurisdiction to review. The majority opinion does not mean that New Castle shall not have its sewer. If that should be the end result of the judicial process it will be only because Congress, not the courts, determined the national policy against the particular use of federal funds, which the courts were required to respect.

## ON REHEARING EN BANC

Before KAUFMAN, Chief Judge, and MOORE, FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MOORE, Circuit Judge:

Some three weeks after a divided panel of this Court reversed Judge Pollack's dismissal of appellants' complaint [1] the Supreme Court announced its decision in *Warth v. Seldin,*[2] a case which originated in this Circuit.[3] Thereupon the federal appellees urged the reconsideration of this case *en banc,*[4] citing both the impact of *Warth* on the earlier panel holding, and the importance of that holding to principles of standing generally. A majority of the *en banc* panel felt similarly, and a rehearing was ordered on August 11, 1975, pursuant to F.R.App.P. 35(a). The appeal was submitted without further oral argument.

In light of the Supreme Court's opinion in *Warth v. Seldin, supra,* and the many recent Supreme Court decisions on the subject of "standing"—or, more accurately, the lack thereof—referred to in the dissent from the original panel's decision, 537 F.2d 571, we now hold that the appellants lack standing to maintain this action because they have sustained no injury as a consequence of appellees' actions. Accordingly, we affirm the district court's dismissal of the complaint as to all appellees.[5]

### I.

The facts, insofar as they bear on appellants' standing to sue, are substantially undisputed, and have been fully set forth in the earlier opinions and dissent. A brief summary will suffice at this point.

In 1969, the King-Greeley Sewer District ("District"), a special purpose district within the Town of New Castle ("Town") in Westchester County ("County"), sought federal aid from the Department of Housing and Urban Development ("HUD") for the construction of a sanitary sewer facility in the hamlet of Chappaqua. In 1972, the Town sought federal funds from the Department of Interior's Bureau of Outdoor Recreation ("BOR") in order to acquire Turner Swamp ("Turner") for preservation as a wildlife area and public park. Both of these grants were approved. Thereafter the Tri-State Regional Planning Council ("Tri-State"), a regional "clearinghouse" in the area for coordination and review of federal grants, declined to review the propriety of the grants.

Appellants—who do not dispute the need of Chappaqua's residents for a sewer or the desirability of preserving Turner for public

1. *Evans v. Lynn,* 376 F.Supp. 327 (S.D.N.Y. 1974), *rev'd,* 537 F.2d 579 (2d Cir. 1975). At the time the earlier opinions were announced, James T. Lynn was the Secretary of Housing and Urban Development. He has been succeeded by Carla A. Hills, who now appears as appellee of record pursuant to F.R.App.P. 43(c).

2. 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

3. *Warth v. Seldin,* 495 F.2d 1187 (2d Cir., 1974). The Court's opinion, subsequently affirmed by the Supreme Court, n. 2 *supra,* was announced by Judge Hays and concurred in by Judges Moore and Timbers.

4. Appellee's petition was brought pursuant to F.R.App.P. 35(b).

5. The earlier panel's affirmance of the dismissal as to Tri-State Regional Planning Council is, of course, left undisturbed.

recreational use—filed an action in federal district court claiming that the grants amounted to support of the Town's primarily white, single-family housing pattern in violation of the federal government's affirmative duty to eliminate discrimination and encourage fair housing opportunities in the United States.[6] Appellants allege that they are persons "aggrieved" by the action of the federal agencies and Tri-State within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702, and the 1968 Civil Rights Act, 42 U.S.C. § 3610(a) and (d). Standing to sue is asserted on the ground that appellants are low and moderate income individuals[7] belonging to minority groups who have suffered, as a result of the federal agencies' "absence of meaningful civil rights enforcement",[8] a lessening of "federal impetus"[9] to encourage integration and fair housing in the County. Appellants make no specific allegations of damage.

Appellants do not reside in the Town. They make no claim that they have ever sought or been refused housing in the Town. They have no interest in any Town property, or connection with any past or proposed housing project in the Town. They do not allege that either of the challenged projects will discriminate against them. They make no claim that the federal funds were diverted from any actual or proposed housing project that could have been of benefit to them. In short, they allege no specific, personal, adverse results whatsoever from the grants for sewer and park construction.[10]

## II.

The aid of the federal courts is not freely available to all who seek it. Access to the courts is restricted by judicial discretion,[11] regulated by statute,[12] and subject to the overriding limitation[13] of Article III of the Constitution that the federal courts decide only cases and controversies.[14] The case and controversy requirement is a jurisdictional limitation which can be enlarged neither by act of Congress nor by the courts *sua sponte.* Because it is jurisdictional in nature and Constitutional in origin, it is a "threshold requirement"[15] which must be satisfied before the federal court can take cognizance of any claim. As was recently stated by the Supreme Court in *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975):

The exercise of judicial power under Art. III of the Constitution *depends on* the existence of a case or controversy. As the Court noted in *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 a federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them." *Its judgments must resolve " 'a*

6. Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, and Title VIII of the 1968 Civil Rights Act, 42 U.S.C. § 3601, respectively.

7. These terms are nowhere defined in appellants' briefs or memoranda.

8. Appellants' brief on rehearing at 21.

9. Ibid.

10. On the contrary, Mrs. Evans has conceded that since September, 1973, she has resided in housing which is altogether satisfactory to her.

11. *See, Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

12. Ibid.

13. *Id.,* citing *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

14. These two terms are used interchangeably; "controversy" is distinguishable from "case", if at all, in that it is generally held to embrace only civil actions. *See* C. Wright, *Federal Courts* § 2 (1970); *cf. United States v. Nixon,* 418 U.S. 683, 696–7, 94 S.Ct. 3090, 3102, 41 L.Ed.2d 1039 (1974).

15. In *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) the Supreme Court dismissed petitioners' complaint on the ground that it

"failed to satisfy the *threshold requirement imposed by Art. III of the Constitution* that those who seek to invoke the power of federal courts must allege an actual case or controversy." 414 U.S. at 493, 94 S.Ct. at 675 (emphasis supplied).

*real and substantial controversy admitting of specific relief through a decree of a conclusive character,* as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" Ibid, *quoting* Aetna Life Ins. Co. v. Haworth, *300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). (Emphasis supplied).*

■ The hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation.[16] Standing to sue, in its Constitutional sense, is the showing by a plaintiff that his particular grievance meets this standard,[17] the "essence" [18] of which is the presence of "injury in fact" [19] suffered by the plaintiff as a result of the defendant's actions.[20]

■ Mere interest in, or concern over, a prospective defendant's acts—no matter how deeply felt—is insufficient to demonstrate injury in fact.[21] What must be shown is a "specific and perceptible harm" [22] —a "concrete injury" [23] actually suffered by the particular plaintiff,[24] or else clearly imminent,[25] which is capable of resolution and redress in the federal courts.[26] Abstract or hypothetical injury is not enough: [27]

16. In the well-known cases of *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), the *Supreme Court* framed the issue in the following manner:
"Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions? This is the gist of the question of standing."
See, also, *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 217–218, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974); *Socialist Labor Party v. Gilligan,* 406 U.S. 585, 586–7, 92 S.Ct. 1716, 1718, 32 L.Ed.2d 317 (1972). *Cf. Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959–960, 22 L.Ed.2d 113 (1969).

17. " '[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution'." *Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 151–2, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), quoting *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

18. "[W]hatever else the 'case or controversy' requirement embodie[s], its essence is a requirement of 'injury in fact'." *Schlesinger v. Reservists to Stop the War, supra* at 418 U.S. 218, 94 S.Ct. 2931, citing *Association of Data Processing Service Org., Inc. v. Camp, supra* at 397 U.S. 152, 90 S.Ct. 829.

19. Ibid.

20. *See, Flast v. Cohen, supra,* at 392 U.S. 102, 88 S.Ct. 1953–4; *Warth v. Seldin, supra,* at 422 U.S. 504–5, 95 S.Ct. 2208; *Linda R. S. v. Rich-* ard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

21. *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

22. *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

23. *Schlesinger v. Reservists to Stop the War, supra at* 418 U.S. 222, 94 S.Ct. 2932.

24. *Sierra Club v. Morton, supra* at 405 U.S. 740, 92 S.Ct. 1368–9; *United States v. SCRAP,* at 412 U.S. 687, 93 S.Ct. 2415–6.

25. *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).

26. *Preiser v. Newkirk, supra* at 422 U.S. 401, 95 S.Ct. 2334.

27. *See, North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), wherein the Court, quoting *Aetna Life Ins. Co. v. Haworth, supra* at 300 U.S. 240–1, 57 S.Ct. 464, held that:
"To be cognizable in a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * *It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character,* as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " (quotation marks omitted and emphasis supplied).
See, also, *Schlesinger v. Reservists to Stop the War, supra,* at 418 U.S. 221–222, 94 S.Ct. at 2932, quoting from *McCabe v. Atchison, T. & S. F. R. Co.,* 235 U.S. 151, 164, 35 S.Ct. 69, 59 L.Ed. 169 (1914); *DeFunis v. Odegaard,* 416

Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. *A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action,* not that he can imagine circumstances in which he could be affected by the agency's action. And it is equally clear that the allegations must be true and capable of proof at trial. *United States v. SCRAP, supra,* at 412 U.S. 688–9, 93 S.Ct. at 2416 (emphasis supplied).

 While a particular statute may confer rights upon a party, it cannot abrogate the *Constitutional* requirement that a plaintiff *in fact* suffer some injury due to a breach of the law in order to maintain an action in the federal courts.[28] Whether or not a plaintiff falls within the "zone of interests"[29] protected by the statute—whether he can, in other words, rightfully assert whatever rights are granted by statute—is an entirely separate inquiry from the question of whether injury has been suffered *per se.* When it rejected the notion of "legal interest" as a test for determining standing to sue, the Supreme Court held in *Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970):

The "legal interest" test goes to the merits. The question of standing is different. It concerns, *apart from the "case" or "controversy" test,* the question whether the interest sought to be protected by the complainant is arguably within

the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. 397 U.S. at 153, 90 S.Ct. at 830.

Recognition of the practical need for a "zone of interests" type determination was evidenced by the Court's comment, in the same case, that "[w]here statutes are concerned, the trend is toward *enlargement of the class of people* who may protest administrative action."[30] However, as Chief Justice Burger subsequently made clear, such an inquiry does not supersede or in any way encroach upon the threshold determination of injury in fact.[31]

Although we there [referring to *Association of Data Processing Service Org., Inc. v. Camp, supra*] noted that the categories of judicially cognizable injury were being broadened, we have more recently stressed that the broadening of *categories* "is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). And, in defining the nature of that injury, we have only recently stated flatly: "Abstract injury is not enough." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 218, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974). (citation omitted; emphasis in original).

The Constitutional limitation imposed by the case or controversy requirement has

---

U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); and most recently, *Rizzo v. Goode,* 423 U.S. 362, 371–72, 96 S.Ct. 598, 604, 46 L.Ed.2d 561, 44 L.W. 4095, 4098 (1976).

**28.** *See, O'Shea v. Littleton, supra* at 414 U.S. 493–494, 94 S.Ct. 675; *Schlesinger v. Reservists to Stop the War, supra* at 418 U.S. 218, 94 S.Ct. 2931.

"We have previously noted that Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute. *But such statutes do not purport to bestow the right to sue in the absence of any indication that invasion of the statutory right has occurred or is likely to occur.*"

*O'Shea v. Littleton, supra* at 414 U.S. 493–4, n. 2, 94 S.Ct. 675 (quotation mark and citations omitted; emphasis supplied).

**29.** *Association of Data Processing Service Org., Inc. v. Camp, supra* at 397 U.S. 153, 90 S.Ct. 830.

**30.** *Ibid.* (emphasis supplied).

**31.** *See, also, Sierra Club v. Morton, supra* at 405 U.S. 733, n. 5, 92 S.Ct. 1365, wherein the Court, finding that the petitioner had suffered no injury in fact, did not reach the issues concerning the "zone of interests" under the statute.

been specifically applied to the "person aggrieved" language of section 810(a), 42 U.S.C., of the Civil Rights Act of 1968, on which appellants primarily rely to support their claims of standing. In *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Supreme Court held that where housing discrimination was alleged, the language of § 810(a) reflected "a congressional intention to define standing as broadly *as is permitted by Article III of the Constitution."* [32] The petitioners' standing to sue was upheld on the express ground that

> *Individual injury or injury in fact to petitioners,* the ingredient found missing in *Sierra Club v. Morton [supra] is alleged here.* 409 U.S. at 209, 93 S.Ct. at 367 (emphasis supplied).

**32.** 409 U.S. at 209, 93 S.Ct. at 367 (quotation marks and citation omitted; emphasis supplied). *See, also, Rizzo v. Goode, supra* 423 U.S. at 370–71, 96 S.Ct. at 604, at 44 L.W. 4098, wherein the Court reached a similar conclusion respecting the right to allege deprivation of civil rights under 42 U.S.C. § 1983 (Civil Rights Act of 1871); and *Association of Data Processing Service Org., Inc. v. Camp, supra* at 397 U.S. 153–4, 90 S.Ct. 830, and *Sierra Club v. Morton, supra* at 405 U.S. 739, 92 S.Ct. 1368, wherein the Court held similarly respecting suits brought under Administrative Procedure Act § 702.

**33.** *Warth v. Seldin, supra,* 422 U.S. at 492–496, 95 S.Ct. at 2203–4.

**34.** Appellants have pleaded the violation of a federal statute as the basis for their action and their standing to sue. However, the alleged violation exists only because the grants were purportedly made to a locality which, through the maintenance of zoning laws, has preserved itself as an allegedly affluent white suburb which is inaccessible to the appellants. Their claims of damage flow—if at all—from the Town's exclusionary practices, not from the specific grant of federal aid. This is an indirect route to the same charge made more directly in *Warth,* to wit, an alleged exclusion from housing of their choice in a more integrated neighborhood.

We note that the appellants at bar are not the only plaintiffs who have attempted indirectly to attack local housing laws by pleading the violation of federal housing law. In *Cornelius v. City of Parma,* 374 F.Supp. 730 (N.D. Ohio 1974), *aff'd* 521 F.2d 1401 (6th Cir. 1975), *cert. denied* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 360, 44 LW 3501 (1976), five assertedly low

## III.

Any doubt that the appellants in this case have alleged only abstract injury which is constitutionally insufficient to sustain their standing to sue, has been resolved by the Supreme Court's decision in *Warth v. Seldin, supra, Warth* involved a Constitutional challenge to the zoning practices in the suburban town of Penfield, New York. Among the petitioners were individuals who asserted standing to sue on the basis of their status as low and moderate income individuals who were members of a minority group, and were suffering from the town's exclusionary pattern of housing which preserved it as a primarily white enclave of single-family dwellings [33]—the same civil rights allegations which are made by appellants in the present case.[34]

income black individuals residing outside the city of Parma joined with two white citizens of Parma and three organizations in charging that Parma's discriminatory housing practices— specifically, local ordinances prohibiting low income housing projects absent a referendum and establishing a height limitation for buildings—violated, *inter alia,* the Fair Housing Act of 1968, 42 U.S.C. § 3601; jurisdiction was asserted under 42 U.S.C. § 3612. The district court stated that

> *"A fair reading of the complaint indicates that its basic thrust is directed against Parma's adoption and implementation of the ordinances previously discussed in regard to the Government's suit.* It is alleged that the City's conduct, in enacting and implementing these ordinances, was aimed at setting up barriers to exclude low and moderate income blacks and other minorities from living in the City. The ordinances are said to have the further effect of maintaining the virtually all-white character and image of Parma, depriving white residents of Parma of the benefits of an integrated community, discouraging prospective builders and sponsors of low-income housing from building within the City of Parma, interfering generally with federally assisted housing programs, and excluding blacks and other minorities from equal access to jobs in the Parma area as well as equal access to educational opportunities. The plaintiffs in *Cornelius* seek as relief a declaration that the ordinances are void and of no effect, an injunction against Parma and its agents from engaging in further discriminatory housing practices and affirmative remedial action.

> \* \* \* \* \* \*

> ". . . The challenged conduct of Parma in enacting the ordinances has not as yet

Writing for the Court, Mr. Justice Powell reiterated the primacy of Article III's requirement of injury in fact *irrespective* of any right of action granted by statute,[35] and concluded that the petitioners had failed to allege such injury. Because the Court's analysis bears so directly on the instant case, we quote at length from the *Warth* opinion.

 . . . [W]e turn first to the claims of Petitioners Ortiz, Reyes, Sinkler, and Broadnax, each of whom asserts standing as a person of low or moderate income and, coincidentally, as a member of a minority racial or ethnic group. We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons of low and moderate income, many of whom are members of racial or ethnic minority groups. We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the *constitutional and statutory rights* of the persons excluded.

"But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that they *personally have been injured*, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the *requisite case or controversy between themselves personally and respondents*, "none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). See, *e. g., Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–551, 7 L.Ed.2d 512 (1962).

In their complaint, petitioners . . alleged in conclusory terms that they are among the persons excluded by respondents' actions. None of them has ever resided in Penfield; each claims at least implicitly that he desires, or has desired, to do so. Each asserts, moreover, that he made some effort at some time, to locate housing in Penfield that was at once within his means and adequate for his family's needs. Each claims that his efforts proved fruitless. We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a *substantial probability* that they would have been able to purchase or lease in Penfield *and*

directly and immediately injured plaintiffs. No actual conflict has yet arisen between the rights of the low and moderate income plaintiffs and the actions of the defendants relative to these ordinances. *Indicative of the presence of abstract injury only is the fact that if the Court were to entertain this suit and on the merits declare the suspect ordinances invalid, this judicial action would not serve as the catalyst for the construction of the housing undeniably needed by plaintiffs.*" 374 F.Supp. at 733, 739 (emphasis supplied) The district court held, as we hold here, that the asserted cause of action did not present a case or controversy. 374 F.Supp. at 739. The district court's holding was affirmed without opinion by the Court of Appeals, and *certiorari* was recently denied by the Supreme Court which apparently continues to adhere to the holding in *Warth v. Seldin, supra.*

35. ". . . Congress may grant an express right of action to persons who otherwise would be barred *by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself*, even if it is an injury shared by a large class of other possible litigants."
422 U.S. at 501, 95 S.Ct. at 2206 (citation omitted; emphasis supplied).

*that, if the court affords the relief requested, the asserted inability of petitioners will be removed. Linda R. S. v. Richard D., supra.*

We find the record devoid of the necessary allegations. . . .

\* \* \* \* \* \*

. . . Petitioners here . . . rely on little more than the *remote possibility*, unsubstantiated by allegations of fact, that their situation *might* have been better had respondents acted otherwise, and *might* improve were the court to afford relief.

We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm *him*, and that he *personally* would benefit *in a tangible way* from the courts' intervention. Absent the necessary allegations of *demonstrable, particularized injury*, there can be no confidence of a "real need to exercise the power of judicial review" or that relief can be framed "no [broader] than required by the precise facts to which the court's ruling would be applied." *Schlesinger v. Reservists Committee to Stop the War, supra*, 418 U.S., at 221–222, 94 S.Ct., at 2932." *Warth v. Seldin, supra*, at 422 U.S. 502–4, 507–8, 95 S.Ct. at 2207–8, 2209–10 (footnotes omitted; emphasis supplied in part; brackets in original).

■ The same rationale applies with equal, if not greater, force to the case at bar. Here, appellants have failed to allege *any facts whatsoever* indicative of injury suffered by them as a result of the grants to the District and the Town. They do not claim, as did the petitioners in *Warth*, that they unsuccessfully sought housing in the Town, or that the Town arbitrarily rejected housing proposals of benefit to them. They claim only that, had the grants not been approved, the monies *could conceivably* have gone to some other, as yet *totally imaginary* project in the County which *might* have had the result of making more housing available to them. This goes beyond even the realms of "remote possibility" which were rejected in *Warth*. It amounts to pure speculation and conjecture and, needless to say, it is completely inadequate to demonstrate the requisite injury under Article III.

We note that, as in *Warth*, the injunctive relief sought by the appellants here would not likely result in any improvement of their housing status. Indeed, since the appellants here do not allege that the grants deprived them of any actual housing opportunities—in contrast to the *Warth* petitioners, who claimed that they had been deprived of the benefits of at least two proposed housing developments—there is even less likelihood in this case that an injunction restraining the federal agencies would result in any betterment of appellants' housing status in the County. The link between the ill allegedly suffered and the remedy requested is so tenuous as to approach the non-existent.

### IV.

The Supreme Court has warned repeatedly in the past of the hazards in straying from the Constitutional requirement of a case or controversy.[36] Absent adherence to the Constitutional mandate, courts become forums for the vindication of personal values and political preferences, usurping the legislative branch as the focus for public debate and lobby, and usurping as well the executive's primary responsibility for the implementation of federal law. Federal courts cannot, consistent with the Constitution, exercise their jurisdiction to vindicate litigants' chosen causes;[37] *they are empowered only to grant specific relief in response*

---

**36.** *See, e. g., North Carolina v. Rice, supra* at 404 U.S. 246, 92 S.Ct. 404; *Sierra Club v. Morton, supra* at 405 U.S. 732, n. 3, 92 S.Ct. 1365; *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201–2, 24 L.Ed.2d 214 (1969); *Flast v. Cohen, supra* at 392 U.S. 96, 88 S.Ct. 1950; *cf.*

*Warth v. Seldin, supra* at 422 U.S. 499–500, 95 S.Ct. 2205–6.

**37.** *United States v. SCRAP, supra* at 412 U.S. 687, 93 S.Ct. 2415–6.

*to, and in order to remedy, a particularized showing of individual injury.*[38]

This is not the time, or especially the place, to attempt a general dissertation on judicial supervision of the functioning of administrative agencies. To guard against any such danger it may be tritely said today that the draftsmen of the Constitution in 1789 were not altogether unaware of little-changing human tendencies to endeavor to seize power. The well-defined role assigned to the judiciary is to be found in Article III of that Constitution. To avoid a possible tendency to seek declaratory judgments or advisory opinions on matters possibly hypothetical, the role of the courts under Article III is confined to passing upon an actual "case or controversy". Even within these restricted limits the courts over the years have not suffered from want of business.

Two recent decisions of the Supreme Court would seem to illustrate the continued vitality of Article III and the reluctance of that Court to become an arbiter of all human ills. They are *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and *Hills v. Gautreaux*, —— U.S. ——, 96 S.Ct. 1538, 47 L.Ed.2d 792, 44 LW 4480 (1976). The Supreme Court in *Milliken* reversed the Court of Appeals' affirmance[39] of a multi-district desegregation order, on the grounds that the order constituted an impermissible—indeed, unconstitutional—exercise of the federal courts' equitable powers.[40]

In *Gautreaux* the Court reiterated the importance of this consideration in the strongest language:

Although the *Milliken* opinion discussed the many practical problems that would be encountered in the consolidation of numerous school districts by judicial decree, the Court's decision rejecting the metropolitan area desegregation order was actually based on fundamental limitations on the remedial powers of the federal courts to restructure the operation of local and state government entities. That power is not plenary. It "may be exercised 'only on the basis of a constitutional violation.'" 418 U.S. at [738, 94 S.Ct. at 3124, 41 L.Ed.2d, at 1087], quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 [91 S.Ct. 1267, 1276, 28 L.Ed. 554, 566–67]. See *Rizzo v. Goode*, 423 U.S. 362, [96 S.Ct. 598, 46 L.Ed.2d 561]. Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." 418 U.S. at 744 [94 S.Ct. at 3127, 41 L.Ed.2d at 1091]; *Swann, supra*, [402 U.S.] at 16, [91 S.Ct. at 1276, 28 L.Ed.2d at 566–67].

\* \* \* \* \* \*

. . . [T]he *Milliken* decision was based on basic limitations on the exercise of the equity power of the federal courts

. . . . .

\* \* \* \* \* \*

The District Court's desegregation order in *Milliken* was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a judicial decree restructuring the operation of local government entities that were not implicated in any constitutional violation.

—— U.S. at ——, 96 S.Ct. at 1544, 44 LW at 4483, 4484.

**38.** *Warth v. Seldin, supra* at 422 U.S. 499, 95 S.Ct. 2205.

**39.** *Bradley v. Milliken*, 484 F.2d 215 (6th Cir. 1973).

**40.** "The view of the dissenters [who urge affirmance of the lower court's desegregation order], that the existence of a dual system in [the City of Detroit] can be made the basis of a decree requiring cross-district transportation of pupils, cannot be supported on the grounds that it represents merely the devising of a suitably flexible remedy for the violation of rights already established by our prior decisions. It can be supported only by drastic expansion of the constitutional right itself, an expansion without any support in either constitutional principle or precedent." 418 U.S. at 747, 94 S.Ct. at 3128 (footnote omitted).

Applying these principles to the facts before it, the court in *Gautreaux* concluded that the wrong which was properly complained of by the plaintiffs below [41] was not constitutionally insufficient to support the remedy sought; appropriateness and feasibility of remedy were of crucial importance and a prerequisite to the exercise of the courts' equitable powers.[42] The necessity for continued adherence to the Article III requirements of standing and the proper limitations on the exercise of equity powers was underscored in Mr. Chief Justice Burger's majority opinion in *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), in which the Court held that the taxpayer plaintiff lacked standing to sue.

> "As our society has become more complex, our numbers more vast, our lives more varied, and our resources more strained, citizens increasingly request the intervention of the courts on a greater variety of issues than at any period of our national development. The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must have a 'personal stake in the outcome,' . . . in short, something more than 'generalized grievances,' . . . ." 418 U.S. 166, 179–80, 94 S.Ct. 2948 (citations omitted).

Concurring in the holding in *Richardson*, 418 U.S. at 180, 94 S.Ct. 2940, Mr. Justice Powell offered a cogent analysis of the dangers inherent in the relaxation of the historic and Constitutional restraints on judicial power; we would do well to recall his words:

> Relaxation of standing requirements is directly related to the expansion of judicial power. It seems to me inescapable

that allowing unrestricted taxpayer or citizen standing would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government. I also believe that repeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches. We should be every mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a non-representative, and in large measure insulated, judicial branch. 418 U.S. 188, 94 S.Ct. 2952.

\* \* \* \* \* \*

[W]e risk a progressive impairment of the effectiveness of the federal courts if their limited resources are diverted increasingly from their historic role to the resolution of public-interest suits brought by litigants who cannot distinguish themselves from all taxpayers or all citizens. The irreplaceable value of the power articulated by Mr. Chief Justice Marshall lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action. It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the counter-majoritarian implications of judicial review and the

---

**41.** In *Milliken* the question of "standing" was not involved although the Chief Justice in his opinion must have been aware of this necessity because in a footnote he stated "the standing of the NAACP as a proper party plaintiff was not contested in the trial court and is not an issue in this case." 418 U.S. at 722, note 2, 94 S.Ct. at 3116.

**42.** In *Gautreaux* there was no question but that the plaintiffs (respondents in the Supreme Court had standing to seek vindication of their rights and the defendants made no challenge respecting standing before the district court when they moved to dismiss the action. *See Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907 (N.D.Ill.1969).

democratic principles upon which our Federal Government in the final analysis rests. 418 U.S. 192, 94 S.Ct. 2954.

■ In this action, appellants are invoking the Court's jurisdiction *solely* to impose upon the appellees priorities which the appellants favor. Sincere as their views may be, they are not properly addressed to the courts. Disagreement with government action or policy, however strongly felt, does not, standing alone, constitute an "injury" in the Constitutional sense which is cognizable in the federal courts and susceptible of remedy by the judicial branch; it is a matter properly addressed to the Congress or the Executive.

Accordingly, the judgment of the district court is affirmed, and appellants' complaint is hereby dismissed.

MANSFIELD, Circuit Judge, concurring, with whom TIMBERS, Circuit Judge, joins:

In concurring in Judge Moore's carefully considered opinion I would like to add that, sympathetic as I am to the idea of providing ready court access to those who seek enforcement of civil rights legislation, a holding that federal grants-in-aid may be attacked by persons unaffected by them would violate basic standing requirements that have repeatedly been reaffirmed and enforced by the Supreme Court in recent years. See e. g., *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). There is not the slightest indication in the present record that the plaintiffs will be adversely affected by the federal funding of the New Castle sewer and recreation projects or that if the funding were enjoined as demanded the plaintiffs would be benefitted. What they seek is a ban on federal funding to New Castle because it is allegedly a predominantly white, wealthy, exclusionary community, not because they would thereby gain anything. Should the relief be granted, HUD would presumably be free to use the money to aid construction of sewers and parks in San Francisco.

Thus the case differs sharply from those cited by our esteemed dissenting brothers, in each of which the plaintiffs would be benefitted by the relief sought. In *Hills v. Gautreaux,* —— U.S. ——, 96 S.Ct. 1538, 47 L.Ed.2d 792, 44 U.S.L.W. 4480 (1976), for instance, the plaintiffs, who were tenants in federally funded, racially segregated housing in predominantly black ghetto areas in Chicago, stood to benefit from the relief sought, an order which would eliminate the discrimination against them by directing that such housing, for which they had applied as tenants, must be constructed in predominantly white areas where the plaintiffs might then reside, see 296 F.Supp. at 908 (N.D.Ill.1969). Here plaintiffs gain no comparable benefit from the injunction sought. The most they can realize is the satisfaction that federal funds will not be misused. Absent statutory authorization, this is not enough to confer standing. They must show *some* stake in the outcome. See *Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Our dissenting brothers seek to remedy this glaring deficiency by advancing a theory nowhere found in the complaint: that the grants to New Castle might have a discriminatory effect on what they choose to call a "regional housing market" that would include plaintiffs and New Castle. They also suggest that Congress, by providing that HUD's performance of its affirmative duties under Title VI (1964 Civil Rights Act), 42 U.S.C. § 2000d, and Title VIII (Fair Housing Act of 1968), 42 U.S.C. § 3601, et seq., would be subject to judicial review, intended to give standing to citizens in the position of the plaintiffs here. However, no such authority to sue is to be found in these statutes. Title VI, 42 U.S.C. § 2000d–1, obligates HUD to terminate funds "to the particular program, or part thereof, in which such [discrimination] has been so found" but since this case does not involve an attack upon particularized discrimination plaintiffs cannot use 42 U.S.C.

§ 2000d–2 for judicial review. Title VIII, 42 U.S.C. § 3608, obligates HUD to administer programs in a manner affirmatively to further the purposes of the Act, but there is no indication, express or implied, that Congress intended to give private persons the right to sue HUD for non-compliance with this duty. On the contrary, 42 U.S.C. § 3612, which authorizes enforcement of certain provisions of the Fair Housing Act (§§ 3603 through 3606) by private civil action, omits § 3608, the section outlining HUD's general duties, which is allegedly violated here by HUD. Title 42 U.S.C. § 3610 is limited to suits against private persons alleged to have violated the Act, which may be brought only after voluntary compliance proceedings before the Secretary of HUD have failed. Surely if Congress had intended judicial review of HUD's alleged maladministration of the Act, it would not have excluded § 3608 from those sections that might be enforced by private action.

Thus the dissents' suggestion that Congress intended to confer such authority upon private litigants is but an example of the wish becoming the father of the thought. When Congress desires to authorize citizen suits for the enforcement of laws of widespread public interest, it knows how to do so, as it vividly demonstrated in its enactment of § 304(a)(1) of the Clean Air Act, 42 U.S.C. § 1857h–2 and § 505 of the Water Pollution Control Act, 33 U.S.C. § 1365. Here it has not yet taken such action.

1. 42 U.S.C. § 2000d provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 42 U.S.C. § 3601 provides:
 It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

2. The Tri-State Regional Planning Commission (Tri-State) was an original defendant but dismissed as such by the majority of the panel, a decision which is not sought to be reversed by the court en banc. Tri-State's duties are rele-

OAKES, Circuit Judge, dissenting, with whom IRVING R. KAUFMAN, Chief Judge, and FEINBERG and GURFEIN, Circuit Judges, concur:

In this suit, residents of lower-income, predominantly black housing areas in Westchester County, New York, have alleged that federal grants have been improperly awarded to the Town of New Castle, a wealthy, predominantly white community also located in Westchester County. The challenged awards were made to the Town of New Castle by the United States Department of the Interior and the United States Department of Housing and Urban Development. The purpose of the awards was to assist New Castle in the development of Town parkland and the construction of a sewer system. The appellants claim that the two federal departments have statutory obligations, under Title VI of the Civil Rights Act of 1964 and Title VIII of the Civil Rights Act of 1968,[1] 42 U.S.C. §§ 2000d *et seq.*, 3601 *et seq.*, to refuse to make grants which are inconsistent in design or effect with nondiscriminatory, fair housing objectives. Their claim is that the two grants to New Castle are inconsistent with fair housing goals because the grants tend to support and perpetuate patterns of economically and racially discriminatory housing in Westchester County. The complaint is that the federal courts have the responsibility under the Civil Rights Acts to review and strike down grants made by federal departments which have failed to consider the implications of the grants in respect to attainment of the goal of nondiscriminatory, fair housing.[2]

vant, however, to the question to be discussed *infra* regarding the scope of the federal affirmative duty to assure that federal grants are not made for discriminatory purposes or with discriminatory effects. Tri-State is an interstate body, both corporate and politic, serving as a common agency of Connecticut, New Jersey and New York. Created by compact, it has been designated under Circular A–95, promulgated by the Office of Management and Budget, as the areawide clearinghouse for review of applications for federal aid to assure conformance with regional comprehensive plans, to implement the Demonstration Cities and Metropolitan Development Program Act, 42 U.S.C.

The majority of the court, however, has held that appellants are not sufficiently "aggrieved" or "injured in fact" by the grant of federal funds to New Castle to have "standing" to attack the awards. This holding is made despite the fact that appellants are the very persons who, by their own allegations, will continue to suffer from the racially restricted housing environment in Westchester County which is allegedly perpetuated by the challenged federal action. Since it is exactly this sort of third-party injury for which Congress, in 42 U.S.C. § 2000d–2,[3] must have meant to provide relief when it established judicial review of federal grants, and in view of the precedents in both this and other courts upholding standing for challenges to federal grants in similar cases, see *Jones v. Tully*, 378 F.Supp. 286, 287 & n. 1 (E.D.N.Y.1974), *aff'd per curiam sub nom. Jones v. Meade*, 510 F.2d 961 (2d Cir. 1975); *Southern Christian Leadership Conference, Inc. v. Connolly*, 331 F.Supp. 940, 942–44 (E.D.Mich.1971). I must respectfully dissent.

Appellants' complaint, briefly recapitulated, states that appellants are low-income minority (black) residents of Westchester County who live in what the district court called "ghetto living conditions," that is, in racially concentrated low-income neighborhoods, which the district court postulated "are a very real and very serious 'injury'. . . . " *Evans v. Lynn*, 376 F.Supp. 327, 332 (S.D.N.Y.1974). The complaint alleges that the Town of New Castle, to or for whose benefit the challenged grants were made, is, in the words of the district court, "predominantly white [98.7 per cent] and a well-to-do enclave." *Id.* at 330. It is further alleged that 90 per cent of New Castle's land is zoned for single-family, residential development on parcels of more than one acre, that there are currently 7,000 vacant acres and that the median value of single-family homes in 1970 was in excess of $50,000.[4] Appellants quite directly complain that New Castle's zoning ordinance has the purpose and effect of excluding blacks and other racial minorities from living in the Town. Finally, it is alleged that the federal agencies in question approved the grants [5] without performing the affirmative duties required of them by Title VI

§ 3301 *et seq.*, and the Intergovernmental Cooperation Act, 42 U.S.C. § 4231. See 38 Fed. Reg. 228 (1973). The latter commands consideration of impact of the proposed program upon housing and human resources development. 42 U.S.C. § 4231(c). The A–95 Circular specifically calls for comment on the "civil rights aspect of the project," ¶ 3(d), and "[t]he extent to which the project contributes to more balanced patterns of settlement and delivery of services to all sectors of the area population, including minority groups." ¶ 5(d).

3. 42 U.S.C. § 2000d–2 provides in pertinent part:

Any department or agency action taken pursuant to section 2000d–1 of this title [*see* note 6 *infra*] shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. . . .

4. The district court also found that "New Castle continues to be resistant to attempts to alter its present housing character." 376 F.Supp. at 330. The town, it found, had "successfully thwarted" the attempt of the New York State Urban Development Corporation to "construct a small 100-unit low-cost housing facility in the town." *Id.* The Town's master plan sets as a goal "maintaining New Castle as a single-family residential community." It also provides in

reference to sanitary sewer development that "the provision or extension of water and sewers in low [density] residential areas shall not . . . be considered as a basis for rezoning to higher residential density."

5. The grant of matching funds for the sewer was made under the Community Facilities and Advance Land Acquisition Act, 42 U.S.C. § 3102, and the grant for the acquisition of Turner Swamp was made pursuant to the Outdoor Recreation Programs Act, 16 U.S.C. § 460*l*.

The sewer grant was made by HUD to the King-Greeley sewer district in the Chappaqua section of town. The Town of New Castle is, nonetheless, the effective grantee of the benefits of the grant. The recreation grant was made by the Bureau of Outdoor Recreation of the Department of the Interior directly to the Town of New Castle.

The HUD "rating sheet" for the preliminary application for the sewer grant here does carry some points for, *e. g.*, the "Percent of housing in project area that will be accessible on a nondiscriminatory basis to families and individuals with low and moderate incomes," but there appears to be no evaluation of the overall residential segregation policies of the community. It is a matter of defense on the merits, which are not reached, whether the agencies in

and Title VIII.[6] A consideration of the law of standing as it relates to this case must assume that all of these facts as alleged are true.[7] It at least has to take them into

fact performed their affirmative duties. For our purposes it is enough if a viable claim of nonperformance is made.

The BOR grant was allegedly made without any reference to civil rights enforcement procedures or any Title VIII obligations, though a Title VI compliance form was attached to the application, signed by the Town Supervisor.

6. The affirmative duties, following the policies set forth in note 1 *supra*, are respectively imposed by 42 U.S.C. § 2000d–1 (Title VI) and 42 U.S.C. §§ 3608(c), (d)(5) (Title VIII). The former provides:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability ·which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 3608 provides in part:

(c) All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the purposes of this subchapter and shall cooperate with the Secretary to further such purposes.

(d) The Secretary of Housing and Urban Development shall—

. . . . .

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.

See generally as to Title VIII, the panel opinion, *Evans v. Lynn,* 537 F.2d 571, 576 n. 10 (2d Cir. 1975).

7. It is possible, of course, that the "pinpoint provision" in 42 U.S.C. § 2000d–1 may provide a defense on the merits under this section. Under that provision, compliance with nondiscrimination requirements may be obtained by agency

refusal to grant . . . assistance . . to any recipient as to whom there has been an express finding . . . of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity . . . and, shall be limited in its effect to the particular program . . . in which such noncompliance has been so found . . ..

42 U.S.C. § 2000d–1 *(emphasis supplied).* Judge Mansfield, in his concurrence, argues that no discrimination could be "found" in the particular grants involved in this case and, therefore, the appellants have no right to overturn these grants under the review provision in 42 U.S.C. § 2000d–2. Surely the question of what findings can properly be made in this case raises issues going far into the merits of appellants' claim and, therefore, should not be decided prematurely at the present appeal which concerns only the subject of appellants' standing to raise the claim. Nonetheless, I feel it appropriate to indicate that the matter is far more complex than Judge Mansfield suggests

On the pleadings of this case, which allege that New Castle has pursued zoning and housing policies with the purpose and effect of excluding blacks and other racial minorities from living in the town, there can be little doubt that the Town is in violation of the nondiscrimination requirements adopted pursuant to 42 U.S.C. § 2000d–1 by HUD, *see* 24 C.F.R. § 1.1 *et seq.,* and Interior, *see,* 43 C.F.R. § 17.1 *et seq.* The question as to the applicability of the "pinpoint provisions" in this case therefore turns on whether the sewer and park grants to the Town are programs "in which such non-

account which, I regret to say, the majority opinion does not.

Fundamental to analysis under the law of standing, in view of the vague generalities oftentimes employed to decide particular cases,[8] is a differentiation between the two important functions the doctrine performs: the first is determining whether the plaintiff is a proper party to request an adjudication of the particular issue, *see Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); the second is determining whether as a matter of policymaking responsibility the particular issue is suitable for determination by the courts, *Barlow v. Collins*, 397 U.S. 159, 169 n. 2, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result). The first of these has been called "access standing" and the second can best be called "decision standing," although the latter often goes by the broad terms "justiciability" or "reviewability" and although it often subsumes a number of other doctrines or techniques which are used by the courts when as a matter of policy it is thought desirable to avoid decisions on the merits.[9] *See* Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv.L.Rev. 645 (1973), cited by Mr. Justice Powell in *Warth v. Seldin*, 422 U.S. 490, 500 n. 11, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Cf.* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 156 (2d ed. 1973). The Court's present analysis directs us first to examine the question "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)." *Warth v. Seldin, supra,* 422 U.S. at 498–99, 95 S.Ct. at 2205. This is in essence the question of access standing.

Have the appellants alleged such a personal stake in the outcome of *this* controversy? In this connection it must be remembered that the controversy sought to be determined is *not,* as in *Warth v. Seldin, supra,* whether a town in which the plaintiffs are not resident may exclude persons of low and moderate income by its zoning laws. Rather, on the allegations, the question brought in this case is whether federal agencies administering grants-in-aid may approve grants to "activities" (the Town of

---

compliance has been so found. . . . " Judge Mansfield would consider "noncompliance" to have been "found" in the sewer and park grants only if the particular programs were being administered on a visibly discriminatory basis, *e. g.,* by prohibiting minorities from using the parks and sewers of New Castle. This strikes me as an unduly restrictive reading of the limitation. Where a particular grant is used as one step in furtherance of a discriminatory scheme, the fact that the administration of the grant is facially neutral should not foreclose a finding that the grant is in implicit, if veiled, noncompliance with the nondiscrimination requirements. Here appellants claim that ostensibly neutral grants (sewer and park grants) *directly* assist a political entity (New Castle) to attain its discriminatory scheme (by foreclosing opportunities for low-income housing development in New Castle, *see* text at notes 13 & 14, *infra*). It is totally unrealistic to suppose that federal grants in aid to local communities for sewage or recreation/wildlife areas, or for that matter water systems, do not exert a significant leverage on the location and type of housing, or, where made to communities with exclusionary policies, the perpetuation of those policies. *See* C.

Haar & D. Iatridis, Housing the Poor un Suburbia 338 (1974). HUD's own rating sheets relative to *these* grants constitute an administrative construction of the statute contrary to that espoused by Judge Mansfield. This construction is entitled to substantial weight under *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Udall v. Tallman,* 380 U.S. 1, 18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). A district court, after a full hearing, could properly "find" the grant to be discriminatory in both design and effect and therefore not in compliance with the statutory requirements.

**8.** *See* 3 K. Davis, Administrative Law Treatise § 22.18 (1958); *Association of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 25 L.Ed.2d 84 (1970).

**9.** *Compare* Bickel, *The Supreme Court, 1960 Term—Foreword: The Passive Virtues,* 75 Harv.L.Rev. 40 (1961), *with* Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv.L.Rev. 1 (1959), *and* Gunther, *The Subtle Vices of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review,* 64 Colum.L.Rev. 1 (1964).

New Castle) whose practices (exclusionary zoning) have the purpose and effect of subjecting blacks and other racial minorities to discrimination by excluding them from residence within the Town's borders, 42 U.S.C. § 2000d; *see also* 42 U.S.C. § 3608.[10] If minorities are "denied the benefits" of such grants because of the discriminatory access limitations of Town zoning policies, 42 U.S.C. § 2000d indicates that the grants should not be made, and 42 U.S.C. § 2000d–2 provides for judicial review to enforce that law. Accordingly, *Warth v. Seldin,* so heavily relied on by the majority opinion, is sharply distinguishable from the present case. Indeed, it is helpful to appellants. In *Warth* the Court was extremely careful to point out not only that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes

creating legal rights, the invasion of which creates standing . . . .'"[11] but also that "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules."[12] *Warth* itself involved no such statutes; here the statutory claim is the essence of appellants' case. In *Warth,* the parties denied standing had failed to show how the specific town practices which they challenged (zoning laws) had resulted in the type of particularized injury required to obtain standing to litigate a generalized constitutional challenge to government action. 422 U.S. at 508, 95 S.Ct. 2197. *See Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221–22, 94 S.Ct. 2425, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 177, 179–80, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). In the

10. *See* notes 1 and 6 *supra.* That the affirmative duties imposed were intended by Congress to be meaningful is evidenced, *e. g.,* by the remarks of Senator Mondale in connection with the 1968 Civil Rights Act, relied upon in *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). He referred to the

> sordid story of which all Americans should be ashamed developed by this country in the immediate post World War II era, during which the FHA, the VA, and other Federal agencies encouraged, assisted, and made easy the flight of white people from the central cities of white America, leaving behind only the Negroes and others unable to take advantage of these liberalized extensions of credit and credit guarantees.
> Traditionally the American Government has been more than neutral on this issue. The record of the U.S. Government in that period is one, at best, of covert colloborator in policies which established the present outrageous and heartbreaking racial living patterns which lie at the core of the tradegy of the American city and the alienation of good people from good people because of the utter irrelevancy of color.

114 Cong.Rec. 2278 (1968). So, too, Representative Celler said: "The purpose or 'end' of the Federal Fair Housing Act is to remove the walls of discrimination which enclose minority groups in ghettos . . . ." 114 Cong.Rec. 9563 (1968). *See* U.S. Commission on Civil Rights, Equal Opportunity in Suburbia 67–70 (1974).

11. 422 U.S. at 500, 95 S.Ct. at 2206, *citing Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Sierra*

*Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

12. 422 U.S. at 501, 95 S.Ct. 2197. The "prudential rules" to which Justice Powell refers include the rule that "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens . . . normally does not warrant exercise of jurisdiction." *Id.* at 499, 95 S.Ct. at 2205, *citing Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2425, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 188–97, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Similarly, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), *citing Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). At the same time, an attenuated injury suffered in common with many others may still be enough to establish standing. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *See also* Scott, *Standing in the Supreme Court—A Functional Analysis,* 86 Harv.L.Rev. 645, 681 (1973); Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1669, 1730 (1975). Professor Scott concludes that, by virtue of the costs of litigation, "[t]he idle and whimiscal plaintiff, a dilettante who litigates for a lark, is a specter which haunts the legal literature, not the courtroom." 86 Harv.L.Rev. at 674. One would suppose this was all the more true in the light of *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

instant case, as shall be shown below, the connection between the challenged action (federal grant) and the injury claimed (perpetuation of racially restricted housing environment in Westchester County) is amply direct, under the controlling cases, to supply standing for appellants to seek statutory review of the government action. *See, e. g., United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The majority opinion, with all due respect, misses the point of this law suit when it emphasizes that appellants "do not claim" that they unsuccessfully sought housing in the Town of New Castle or "that the Town arbitrarily rejected housing proposals of benefit to them."[13] The opinion also misapprehends their claim when it states it as saying that "had the grants not been approved, the monies *could conceivably* have gone to some other, as yet totally imaginary project in the County which *might* have had the result of making more housing available to them." [At 595.] Rather, appellants' claim is that the federal departments violated affirmative action requirements of the Civil Rights Acts by making grants to municipalities without evaluating the economic and racial consequence of their housing and development practices, with the effect of maintaining racial residential segregation in Westchester County, further constraining them to continued residence in the county's ghettos.

In cases decided in several circuits, including our own, courts have found that persons who live in concentrated, segregated, low-income housing areas have standing under 42 U.S.C. § 2000d–2 to challenge federal grants which have the effect of increasing the concentration of low-income housing in their portion of the regional housing market. In *Jones v. Meade, supra,* this court, in a per curiam opinion, upheld standing for "several individuals who reside in Spinney Hill" (a low-income predominantly black portion of the Town of North Hempstead, New York) to challenge a federal grant for a low-income housing project in the Spinney Hill area because the grant would tend to "perpetuate racial concentration in the Spinney Hill area in violation of § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d . . . ." *Jones v. Tully, supra,* 378 F.Supp. at 287, aff'd per curiam sub nom. *Jones v. Meade, supra.* See also *Banks v. Perk,* 341 F.Supp. 1175 (N.D.Ohio 1972), aff'd in part, rev'd in part on other grounds, 473 F.2d 910 (6th Cir. 1973); *Gautreaux v. Chicago Housing Authority,* 296 F.Supp. 907 (N.D.Ill.1969), aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 980, 28 L.Ed.2d 236 (1971). *Cf. Shannon v. United States Department of Housing & Urban Development,* 436 F.2d 809, 812, 817–18 (3d Cir. 1970). The claim that the federal grants will have the effect of perpetuating racially segregated housing conditions in the plaintiffs' housing market is precisely the argument made against these federal awards by the appellants in this case. The reasoning which supports their claim may be traced as follows:

1. Patterns of racially segregated housing are perpetuated either by building low-income housing in low-income areas (as in *Jones v. Tully*) or by building high-income housing in high-income areas of the same housing market.[14] This is

---

13. It is not precisely correct that the Town did not arbitrarily reject housing proposals that might have been of benefit to appellants. *See* note 4 *supra.* But this is not the gist of appellants' claim. It goes without saying, as the panel opinion pointed out, p. 574 n. 6, that there is no claim that the sewer or park projects will be operated discriminatorily, but that is not what this suit concerns, either.

14. An initial predicate of this argument, of course, is that New Castle and lower Westchester County are not different housing markets but are part of a larger market of which the entire Westchester County is but a sub-market. Certainly plaintiffs in a low-income black housing area in, say, Cincinnati would not have standing, under this rationale, to challenge grants made to New Castle. This requirement that the challenging parties be within the same housing market as the grantee Town, however,

because, in either case, the construction decision forecloses opportunities for integration of housing facilities throughout the regional housing market.[15]

2. A federal grant to a high-income area which is consistent with increased development of high-income housing but which is inconsistent with development of low-income housing in that area tends to perpetuate patterns of racially segregated housing.

3. The federal parkland and sewer grants challenged in this case are consistent with and promote development of high-income housing in New Castle, but are inconsistent with and negate development of low-cost, high-density housing in that area.

4. The sewer grant is inconsistent with construction of high-density, low-cost housing in New Castle because, as is stated in an affidavit attached to the complaint, the sewer system planned by New Castle "will have the capacity to handle the needs of the area only if the area is developed at low densities. . ." Affidavit of Paul Davidoff, Director of Suburban Action Institute, formerly Associate Professor of Urban Planning at the University of Pennsylvania. Mr. Davidoff's affidavit charged that HUD review of the sewer grant had wholly ignored the role which sewer systems play in shaping the parameters of future community development, and the impact of that development on low and moderate income housing opportunities within the region.

5. The parkland grant may also be inconsistent with development of low-income housing in New Castle because different park facilities (including sizes of open areas and walkways, numbers of, and therefore location of, playing fields, landscaping design, etc.) would be demanded for a high-density housing area than for a low-density area.[16]

The claim of the pleadings that the appellants are "injured in fact" because the federal grants tend to perpetuate economically and racially discriminatory housing in Westchester County, I must insist, represents "something more than an ingenious academic exercise in the conceivable." *United States v. SCRAP, supra,* 412 U.S. at 688, 93 S.Ct. at 2416. The fair sense of appellant's claim is that they have been or "will in fact be perceptibly harmed by the

is undisputably fulfilled in the present case; Tri-State's participation in approval of the grants, note 2 *supra,* is clearcut evidence of this.

The decision of the United States Supreme Court in *Hills v. Gautreaux,* —— U.S. ——, 96 S.Ct. 1538, 47 L.Ed.2d 792, 44 U.S.L.W. 4480 (1976), while dealing with the remedy for HUD's violation of its constitutional and statutory duties in respect to the selection of public housing sites and assignment of tenants, emphasized the metropolitan area relationship in respect to housing market opportunities. As the Court there said, with the greatest of materiality to appellants' claims here, "The relevant geographic area for purposes of the respondents' housing options is the Chicago [substitute Westchester County] housing market, not the Chicago city limits [substitute the boundaries of the Westchester County town or city within which they reside]." —— U.S. at ——, 96 S.Ct. at 1547, 44 U.S.L.W. at 4485. It *is* interesting that in *Hills v. Gautreaux,* the "more substantial question" was said to be "whether an order against HUD affecting its conduct beyond Chicago's boundaries would impermissibly interfere with local governments and suburban housing authorities that have not been implicated in HUD's conduct." *Id.* Here, the alleged improper conduct of HUD relates to grants to local authorities that *have* been implicated in alleged exclusionary zoning.

15. It should be noted that this foreclosure effect is a direct, immediate consequence of the grant. *Cf. O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). This consequence, moreover would be eliminated by a simple reversal of the decision to make the grant. Amelioration of the injury complained of is not, therefore, as in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), one contingent on the future economic decisions of independent third persons. *See id.* at 505, 95 S.Ct. 2197.

16. Appellants do not claim that the parkland should, or could, be developed for housing rather than for recreation. Their complaint must, therefore, be read as alleging the inconsistency of the proposed parkland development with the type of recreational demand which high density housing would create. There is nothing in the record to permit summary judgment against appellants on this point.

challenged agency action." *Id.* As the findings of the district court indicate, the harm appellants will suffer from a perpetuation of the conditions of segregative housing in which they presently live constitutes a "very real and very serious 'injury.'" 376 F.Supp. at 332. Government actions which allegedly perpetuate (if not exacerbate) the injurious condition of segregative housing seem quite plainly to effect an injury-in-fact to the precise type of interest which Congress intended to protect when it enacted Titles VI and VIII of the Civil Rights Act. The apparent thrust of those Titles is to assure that federal grants are consistent with the objectives of nondiscriminatory, fair housing. However, the two federal departments, charged by Congress with the duty of affirmative action to encourage fair housing, economically viable communities, and the breakdown of segregated residential housing, are, if appellants' supporting evidence is to be believed,[17] giving priority to parks and sewers for the privileged communities without regard to the needs for regional development and integration of low-cost housing opportunities.

I think it important, in evaluating the sufficiency of appellants' claims of injury, to note that the plaint of appellants in their county, which is part of Greater New York, finds its echo in many other American localities, many of which are cities and have, to say the least, vast problems in the way of finances, municipal services and quality of life. If federal grant procedures are as appellants allege, they are exacerbating these problems, to appellants' individual disadvantage (and that of many American cities) by enhancing the quality of life in already privileged communities wholly without consideration of the housing needs of those trapped in low-income, segregated housing areas only a few miles away.[18]

Appellants are what Norman Williams has aptly called the "third party non-beneficiaries" of exclusionary land use controls and policies.[19] Their challenge to federal policies or practices which can be said to perpetuate "power to the people who got there first"[20] in their specific area is based on federal statutes. The appellants allege that the grants were made for the sole benefit of a discriminatory grantee, the Town. They have alleged that the effect of the grants is to injure appellants by perpetuating the racially restrictive housing conditions in which they currently live. Accordingly, appellants have stated both a cause for relief *and* standing under 42 U.S.C. § 2000d–2. Only at trial will it become necessary for appellants to prove the truth of the facts alleged. *United States v. SCRAP, supra,* 412 U.S. at 689, 93 S.Ct. 2405. In short, under the controlling precedents in this area, appellants have access standing. *See Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); *Barlow v. Collins, supra; Association of Data Processing v. Camp, supra.*[21]

---

**17.** Robert Mendoza, the HUD official who prepared the rating sheet for the sewer grant, testified that he never reviewed the housing and land-use policies of an applicant community. He "reconstructed" the rating sheet since there was none in the file presented to the district court, but on the "reconstruction," it is claimed, he gave points to New Castle improperly (because of its wealth) so that the application should never have been approved. Howard A. Glickstein, former staff director of the U.S. Commission on Civil Rights, pointed out that HUD had consistently "devoted itself to processing individual complaints of housing discrimination to the exclusion of all other responsibilities under the act." BOR has been, appellants aver, equally delinquent.

**18.** *See* Editorial, City vs. Suburbia, N.Y. Times, Nov. 30, 1975.

**19.** Williams, *The Strategy on Exclusionary Zoning: Toward What Rationale and What Remedy?* 1972 Land Use Controls Annual 177.

**20.** *See* "Housing Programs for Poor Can't Break Into the Suburbs," N.Y. Times News Service, Rutland (Vt.) Daily Herald, Nov. 12, 1975, at 6, quoting Herbert Franklin of Potomac Institute, Inc.

**21.** As the Supreme Court said analogously in *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972), with respect to the legislative history of Title VIII:

The second or "reviewability" aspect of the standing question involves additional judge-made policymaking considerations. They are what Mr. Justice Powell has referred to as "essentially matters of judicial self-governance." *Warth v. Seldin, supra,* 422 U.S. at 500, 95 S.Ct. at 2206. Even assuming there is access standing on the part of appellants, is the issue of the propriety of the HUD or Interior Department grants to New Castle an "abstract questio[n] of wide public significance . . . [which] other governmental institutions may be more competent to address"? *Id.* Should the court decline standing as a matter of policy?[22] A powerful argument can be made that the court should not act as a "planning agency"[23] or as a "congressional inquiry" to correct an Executive Department which has refused to carry out a congressional mandate, especially where the suit might be unmanageable.[24] The Supreme Court decision in *Train v. City of*

*New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975) (agency may not impound water pollution control act appropriations), indicates quite plainly, however, that the courts should not fail in their duty to assure that the Executive has faithfully executed the laws merely because a complex regulatory scheme is involved. *See also National Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 492 F.2d 587 (1974) (federal court may grant declaratory relief ordering Executive to implement federal employees' pay adjustment). Other courts, including our own, have corrected errors in the Executive's administration of congressionally established programs in a multiplicity of cases where, arguably, the alleged damage to the plaintiff has been less or no more direct, where their alleged material interests have been less or no more affected, and where the alleged agency action or inaction has been less or no more egregious than here.[25]

Since HUD has no enforcement powers and since the enormity of the task of assuring fair housing makes the role of the Attorney General in the matter minimal, the main generating force must be private suits in which, the Solicitor General says, the complainants act not only on their own behalf but also "as private attorneys general in vindicating a policy that Congress considered to be of the highest priority." The role of "private attorneys general" is not uncommon in modern legislative programs. *See Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402 [88 S.Ct. 964, 966, 19 L.Ed.2d 1263]; *Allen v. State Board of Elections,* 393 U.S. 544, 556 [89 S.Ct. 817, 22 L.Ed.2d 1]; *Perkins v. Matthews,* 400 U.S. 379, 396 [91 S.Ct. 431, 440, 27 L.Ed.2d 476]; *J. I. Case Co. v. Borak,* 377 U.S. 426, 432 [84 S.Ct. 1555, 12 L.Ed.2d 423].

22. Mr. Justice Brennan in *Barlow v. Collins,* 397 U.S. 159, 178, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (concurring opinion), and Scott, *supra* note 12, at 684, believe standing narrowly and properly should refer to what the latter has called "access standing." *See also* K. Davis, Administrative Law Treatise § 22.00-04, at 723 (Supp.1970).

23. Professor Stewart has used this term in reasoning against wholly unlimited access standing. *See* Stewart, *supra* note 12, at 1737.

24. Unmanageability might exist here if the general policy of HUD grant-making, as opposed to the specific grants to New Castle, had been the subject of the appellants' claim. *But see*

*Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159, 1162 (1973) (en banc) (challenge to HEW school desegregation policies generally).

25. *E. g., Schlafly v. Volpe,* 495 F.2d 273 (7th Cir. 1974) (persons complaining of cessation of highway construction funded by federal gas tax, on basis they would benefit from use of highways); *Davis v. Romney,* 490 F.2d 1360 (3d Cir. 1974) (buyers of FHA-insured homes challenging failure to require obedience to local housing codes; *Bradley v. Weinberger,* 483 F.2d 410, 413–14 n. 1 (1st Cir. 1973) (patients and doctor challenging labeling requirements as too strenuous); *Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973) (en banc) (black students, citizens and taxpayers challenging HEW failure to enforce 10 state operated and numerous other school district desegregation plans); *City of Inglewood v. City of Los Angeles,* 451 F.2d 948 (9th Cir. 1972) (adjacent city affected by noise from federally financed airport); *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2d Cir. 1968) (persons displaced by urban renewal); *Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) (representatives of "aesthetic, conservation and recreation" interests not resident of the town where the project was to be located). *See also Eastern Kentucky Welfare Rights Org. v. Shultz,* 370 F.Supp. 325 (D.D.C.1973) (welfare organization challenging IRS regulation

The courts have taken the view that agency disregard of congressional mandate is challengeable by persons affected adversely because it *involves*, it does not negate, deference to another branch of the Government. As Mr. Justice Powell, concurring in *United States v. Richardson, supra*, pointed out:

> The doctrine of standing has always reflected prudential as well as constitutional limitations. . . . Whatever may have been the Court's initial perception of the intent of the Framers . . it is now settled that such rules of self-restraint are not required by Art. III but are "judicially created overlays that Congress may strip away. . . ." . . But where Congress does so, my objections to public actions are ameliorated by the congressional mandate. Specific statutory grants of standing in such cases alleviate the conditions that make "judicial forbearance the part of wisdom."

418 U.S. at 196, n. 18, 94 S.Ct. at 2956.[26] If there were any doubt that this concept is the law of the Court,[27] that doubt was removed by *Warth v. Seldin.* There, speaking through Mr. Justice Powell, the Court held:

> Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. *E. g., United States v. SCRAP,* 412 U.S. 669 [93 S.Ct. 2405, 37 L.Ed.2d 254] (1973). But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights

permitting charitable exemption status to hospitals which do not provide for free care for indigents).

**26.** *See also Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J., concurring).

and interests of others, and, indeed, may invoke the general public interest in support of their claim. *E. g., Sierra Club v. Morton,* 405 U.S. [727] at 737 [92 S.Ct. 1361, at 1367, 31 L.Ed.2d 636] (1972); *FCC v. Sanders Radio Station,* 309 U.S. 470, 477 [60 S.Ct. 693, 698, 84 L.Ed. 869] (1940).

422 U.S. at 501, 95 S.Ct. at 2206

> . . . Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute. *Linda R. S. v. Richard D.,* 410 U.S. at [614], 617 n. 3 [93 S.Ct. 1146, at 1148, 35 L.Ed.2d 536 (1973)], citing *Trafficante v. Metropolitan Life Ins. Co.* [409 U.S. 205, at 212, 93 S.Ct. 364, at 368, 34 L.Ed.2d 415 (1972)] (White J., concurring).

422 U.S. at 514, 95 S.Ct. at 2213.

The question remains, of course, whether in this case "Congress has granted a right of action." As discussed above, the plain intendment of Title VI if not Title VIII is to provide for review of federal grants to assure their consistency with federal antidiscrimination and fair housing objectives. *See, e. g., Jones v. Tully, supra* ; note 3 *supra.* Since it is unlikely that either the federal departments or the grant recipients would have any interest in challenging the grants themselves, Congress must have meant to provide for review at the instance of persons "adversely affected" or "aggrieved by" improper grants. The implied right of review for these persons is at least as clear and as significant as in cases such as *Data Processing, Barlow, Arnold Tours* and *Investment Company Institute. Cf. Warth v. Seldin, supra,* 421 U.S. at 501, 95 S.Ct. 2197.[28]

**27.** Its logic was questioned in Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1380–83 (1973).

**28.** As is suggested in Judge Mansfield's concurrence, the argument may be made that Congress did not intend to give private persons the right to sue HUD for noncompliance with its duty of affirmative action, because 42 U.S.C.

What the courts are asked to do here, to require the agencies to reevaluate the grant approvals in the light of the nondiscriminatory, fair-housing mandate,[29] is well within the traditional role of judicial review of agency action. No better authority may be referred to than our own *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608 (2d Cir. 1965), *cert.denied*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), the landmark case that ultimately furnished the basis for National Environmental Protection Act[30] review of project alternatives. It is too obvious to require citation that it is well within the traditional model of judicial review that an agency be required to review an action, involving an expenditure of public funds for purely private or local advantage, to assure that statutory guidelines have been adhered to.

This is not an issue of constitutional involvement as in *Schlesinger v. Reservists Committee to Stop the War, supra* (Article I, § 6 prohibition by members of Congress asserted), or in *United States v. Richardson, supra* (Article I, § 9 violation through CIA appropriation asserted). *See The Supreme Court*, 1973 Term, 88 Harv.L. Rev. 41, 240–43 (1974). In such a case, to resolve the matter judicially may, as has been pointed out,[31] remove the particular issue altogether from *the political process, a danger which* Mr. Justice Frankfurter and others before and after him have warned against in the course of treating the overall subject of judicial review. Here, however, the Congress has spoken, and judicial resolution of the controversy forecloses neither congressional nor executive action. The political

processes would not be imposed upon, much less invaded, by the exercise of Article III power here concerned. In any case, assuming that our system of representative democracy makes the legislature the primary as well as the initial forum for resolving conflicting social and economic interests, if the Congress has spoken and the Executive has not heard the message, the judiciary's role in resolving the controversy is hardly a usurpation of power or an infringement of prerogatives.

One can hardly quarrel with the majority statement of abstract propositions, as they well set forth the rubric of the law of standing. One may regret the majority's application of those rules to this case, one very different, as I see it, from that which the majority perceives.

IRVING R. KAUFMAN, Chief Judge, dissenting, with whom GURFEIN, Circuit Judge, concurs:

I concur fully in my brother Oakes's scholarly opinion. I should like, however, to add the following thoughts.

Constitutional provisions, such as the "case or controversy" requirement of Article III, are not magic talismans, whose import is as immutable as the law of ancient Media and Persia. Rather, the words of the Constitution to a large extent derive their meaning from the perceived needs, desires and expectations of society.

It is legitimate—and, indeed, desirable—to view constitutional commandments, such as the standing requirement, as flexible and evolving over time.[1] The proper approach

---

§ 3610 specifically authorizes enforcement of the Act against *private persons* and omits mention of § 3608, note 1 *supra*, which sets forth HUD's affirmative duties. We are unconvinced, however, that this narrow reading of reviewability under the civil rights statute is appropriate. *Cf. National Welfare Rights Org. v. Finch*, 139 U.S.App.D.C. 46, 429 F.2d 725 (1970) (private standing exists to challenge HEW ruling that state welfare laws conform to federal standards even though only review of HEW decision by states is expressly provided for by statute). *See also* Section 10(a) of the Administrative Procedure Act, 5 U.S.C.

§ 702(a), *and* Stewart, *supra* note 12, at 1726 n. 285.

**29.** Appellants seek injunctive relief, but this would be purely ancillary to the reevaluation sought.

**30.** 42 U.S.C. § 4332(2)(C)(iii).

**31.** *See* Stewart, *supra* note 12, at 1741.

**1.** The words of Chief Justice Warren, referring to the Eighth Amendment in *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), are informative:

may best be shown by very briefly reviewing the courts' construction of other constitutional provisions, where this process is more obvious. The First Amendment guarantee of freedom of religion, for example, was, when drafted in 1789, almost certainly intended to refer exclusively to the worship of God.[2] But today the concept of religion has been expanded to protect, under some circumstances at least, not only the worship of a divinity or the refusal to recognize a divinity, but also some, if not all, deeply held moral convictions.[3] Similarly, the First Amendment meaning of "speech" has come to include silent protest.[4] And the definition of "search", as used in the Fourth Amendment, has in recent years been expanded beyond the physical intrusion which concerned the Framers,[5] to encompass electronic eavesdropping.[6]

This expansive reading of the provisions of the Bill of Rights may plausibly be viewed as a process—which some argue has not reached its limit—by which courts have extended the protection accorded individual autonomy.[7] A similar process may be discerned in the interpretation of the shibboleths of standing: "case or controversy",

and its corollary, "injury in fact". The past decade has seen a dramatic lowering of the barriers imposed by standing requirements to challenges to administrative action. Perhaps not by change, this movement toward broader standing has coincided with a spectacular increase in the size, scope and power of the bureaucracy of the executive branch—which has, some argue, heightened the need for judicial oversight. During these years, the archaic "legal interest" requirement of *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939) has been abolished, *Assoc. of Data Processing Service Org. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Standing to challenge administrative orders has been given to competitors, *id.*, and to consumers, *Office of Communication v. FCC*, 123 U.S.App.D.C. 328, 359 F.2d 994 (per Burger, J., 1966), and a showing of economic injury is no longer required. *U. S. v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

As this trend makes clear, judicial review is, today viewed as a legitimate means of ensuring that agencies observe congression-

---

[T]he words of the Amendment are not precise, and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

2. This may be seen by examination of various colonial documents advocating religious freedom. The 1772 *Rights of the Colonists*, for example, espoused freedom of religion because of its concern with "various attempts which have been made and are now making, to establish an American Episcopate." The Bill of Rights: A Documentary History of 210 (Chelsea House, 1971). And the first document to protect freedom of religion, the Maryland Toleration Act of 1649, declared that it dealt with "matters concerning Religion *and the honor of God*" and granted freedom only to those "professing to beleive [sic] in Jesus Christ." *Id.* at 91, 93 (emphasis added). Of perhaps even greater significance, the Senate eliminated the words "nor shall the rights of conscience be infringed" from the First Amendment. *Id.* at 1146.

3. *See, e. g., U. S. v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Welsh v. U. S.*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *U. S. v. Sisson*, 297 F.Supp. 902

(D.Mass.1969) (Wyzanski, J.), *appeal dismissed for want of jurisdiction*, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Although *Seeger* and *Welsh* theoretically rested upon interpretations of the Selective Service statutes, the *Seeger* Court stated that a different holding would "classify different *religious* beliefs, exempting some and excluding others", thus presumably violating the guarantee of equal protection. 380 U.S. at 176, 85 S.Ct. at 859 (emphasis added).

4. *See, e. g., Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966).

5. The Colonial tracts were concerned with the "insolence" of British officers who would "enter our houses, search, insult and seize at pleasure." The Bill of Rights: A Documentary History, *supra* n. 2, at 488–89.

6. *Compare Katz v. U. S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) *with Olmstead v. U. S.*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

7. *Cf.* Henkin, Privacy and Autonomy, 74 Colum.L.Rev. 1410 (1974).

al mandates.[8] The case before us cannot be viewed in isolation from this trend.

Obviously, I do not suggest that we read the Art. III standing requirement out of existence, or that courts indulge in rendering what Justice Holmes once called "mere declaration[s] in the air."[9] Nor, of course, do I urge that we ignore recent decisions of the Supreme Court, such as *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). But I *do* counsel against wooden application of the *Warth* precedent to an entirely different setting, and against extension of that holding to cover a situation which, as Judge Oakes's opinion demonstrates, is sharply distinguishable. Such an expansive reading of *Warth* unnecessarily (and without explanation) flies in the face of the recent trend favoring judicial oversight of the burgeoning administrative bureaucracy.

Under the majority's decision, it is unlikely that there could ever be a plaintiff who will be allowed access to the courts to challenge HUD's abdication of its congressionally-imposed duty.[10] Such a result may be logical, and even desirable, in a controversy more appropriately resolved by the political process. *See U. S. v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). But it is to be shunned in cases like this one which, in my brother Oakes's words, fall "well within the traditional model of judicial review."

GURFEIN, Circuit Judge, dissenting, with whom IRVING R. KAUFMAN, Chief Judge, concurs:

I concur in my brother's Oakes' trenchant analysis.[1] I would like to add that I consider his opinion as an important contribution to a debate that is of historic significance. This type of case may become a watershed in the struggle for civil rights, and I am sorry that we could not muster a majority in this court. The history of civil rights in the next quarter century may be written in terms of procedural roadblocks or we may see an expansion of the role courts will play reminiscent of the expansion in John Marshall's day. There is need for judicial action where Congress has mandated benefits for a class and where an agency of the Executive Branch fails to carry out that legislative mandate. The contrary would give the Executive a silent veto not provided in the Constitution.

This is not a case where general taxpayers are seeking judicial relief against governmental action. The plaintiffs here are not suing as general taxpayers or as officious busybodies. Nor are they seeking to declare any statute or ordinance unconstitutional. They are within the class, minority citizens of the area, whom Congress has sought to help. They are aggrieved persons protesting administrative action in a literal sense. If these plaintiffs have no standing, then who does?

Of course, all black citizens of the entire United States are not in a class to be benefited by a HUD study of the housing policy of New Castle in Westchester County, New York. The class obviously must be more

---

8. In contrast, as Judge Oakes's opinion points out, the taxpayers or citizens whose suits were thwarted by such cases as *U. S. v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), *Schlesinger v. Reservist Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), as well as *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), sought to have the courts intervene in areas in which

> the subject matter is committed to the surveillance of Congress, and ultimately to the political process.

*Richardson, supra,* 418 U.S. at 179, 94 S.Ct. 2940.

9. *Giles v. Harris,* 189 U.S. 475, 486, 23 S.Ct. 639, 48 L.Ed. 909 (1903).

10. It is possible, however, that, even under the majority decision, an inner city near a town receiving a HUD grant may have standing to challenge the grant. Indeed, a town which unsuccessfully applied for a grant might, by analogy with those cases granting competitor standing, be allowed to sue.

1. I have not again reviewed the case authority since my brother Oakes has done that so well.

restricted. The issue, to my mind, is simply whether a county is too large an area for its minority inhabitants to be a discrete class with standing. Since there must be some judicial determination of the nature of the class which is harmed by federal inaction in the face of a clear mandate, it is those minority residents who are reasonably close to the housing opportunity, if it should open up, who have a stake in the Congressional mandate enacted for their benefit.

Local zoning ordinances of the type considered in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), have nothing to do with this case. The challenge there was a constitutional challenge to the local zoning laws. The laws were ostensibly not directed against the minority, but could be taken as directed against persons of low or moderate income. It was held that as a prelude to a constitutional claim of discrimination the plaintiffs must show injury in fact. Here Congress has ordered an administrative agency implementing a particular federal statute to determine whether racially discriminatory policies are being followed by towns which seek federal subsidies. If the finding is that such discrimination is practiced, the funds are to be withheld. But what happens if HUD fails to look into the matter as it is ordered to do, and, nevertheless, approves the federal funding? My brethren in the majority say nothing is to be done about it by anybody. But, as the Court said in *Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." I believe that when Congress imposed on the Secretary of HUD the affirmative duty to administer all "programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter," 42 U.S.C. § 3608(d)(5), it did not mean that HUD may disregard that mandate in its discretion. And those who have an adversary stake in the inaction ought to be able to compel HUD to make whatever study the court finds is required. The analogy is found in the requirement of an environmental impact statement before a project is begun. The federal courts have taken jurisdiction in such cases. See *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The present complaint presents no less a controversy.[2]

We talk of separation of powers. Yet, a narrow holding on standing can be the equivalent of a substantive repeal of the legislation. The issue is really not whether the courts should abstain by denying standing, but whether by rejecting standing the courts are impeding national policy as expressed in the legislative will.

---

2. We are, of course, only at the pleading stage and we may not consider whether the appellants can prove their allegations.